# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jessica Parm, on behalf of herself and all others similarly situated, | Civ. No. 15-3437 (JRT/BRT) |
| Plaintiff, | |
| v. | |
| Bluestem Brands, Inc., | |
| Defendant. | |

---

| | |
|---|---|
| Sara Arce, Anne Bowers, and Neno Osorio, on behalf of themselves and all others similarly situated, | Civ. No. 16-624 (JRT/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Bluestem Brands, Inc., | |
| Defendant. | |

---

Charles D. Moore, Esq., Christopher J. Moreland, Esq., Clayton D. Halunen, Esq., Melissa W. Wolchansky, Esq., Halunen & Associates; Jeffrey D. Kaliel, Esq., Tycko & Zavareei LLP, counsel for Plaintiffs.

Aaron D. Van Oort, Esq., Aaron Knoll, Esq., Erin L. Hoffman, Esq., Staci L. Perdue, Esq., Faegre Baker Daniels LLP, counsel for Defendants.

---

## INTRODUCTION

Plaintiffs Jessica Parm, Sara Arce, Anne Bowers, and Nena Osorio were each

customers of Fingerhut and made purchases by phone or on the Fingerhut website using

credit accounts provided through the Fingerhut website or through Fingerhut customer

service. Plaintiffs have sued Defendant Bluestem Brands, Inc. ("Bluestem"), which is the

company that runs Fingerhut, for violations of various states' usury laws and deceptive

trade practices laws, violations of the Truth in Lending Act, and unjust enrichment, based

on their allegations that Defendant's massive price markups are actually hidden finance

charges.

This matter is before the Court for a Report and Recommendation on Defendant's

Consolidated Motion to Compel Arbitration and Dismiss Without Prejudice (Case

No. 15-3437, Doc. No. 72; Case No. 16-624, Doc. No. 71).[1] *See* 28 U.S.C. § 636 and D.

Minn. Loc. R. 72.1. For the reasons that follow, this Court recommends that Defendant's

motion be granted.

## BACKGROUND

Defendant Bluestem is in the consumer retail business and is the parent to

Fingerhut. (Case No. 15-3437, Doc. No. 76, and Case No. 16-624, Doc. No. 75, Decl. of

Erik Svensen in Supp. of Def.'s Consolidated Mot to Compel Arbitration ("Svensen

Decl.") ¶ 4.) Fingerhut provides a mix of retail and payment options to customers across

the United States through direct mail and Internet shopping channels. (*Id.*) Bluestem

---

[1]     Motions to compel arbitration, like the instant motion, are treated as motions to
dismiss for lack of subject-matter jurisdiction. *See, e.g.*, *Evans v. Hudson Coal Co.*, 165
F.2d 970, 972 (3d Cir. 1948); *Jacobsen v. J.K. Pontiac GMC Truck, Inc.*, No. 01 C 4312,
2001 WL 1568817, at *1 n.1 (N.D. Ill. Dec. 10, 2001). The Court may consider matters
beyond the pleadings in resolving such motions. *E.g.*, *Deuser v. Vecera*, 139 F.3d 1190,
1191 n.3 (8th Cir. 1998); *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 470
(8th Cir. 1993).

partners with WebBank,[2] an FDIC-insured bank, to make credit available to Fingerhut

customers by allowing customers to pay for their purchases through revolving credit

accounts. (*Id.* ¶ 5.) Bluestem services all Fingerhut credit accounts for WebBank. (*Id.*)

All four Plaintiffs were customers of Fingerhut and utilized a credit account

offered by Fingerhut on its website or over the phone. The agreements governing each of

Plaintiffs' credit accounts contained arbitration clauses. The earliest agreement that

applies to any Plaintiff in this case is the MetaBank Fingerhut Credit Account Agreement

(the "2010 Agreement").[3] (Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc.

No. 74, Ex. 4, BB App. 7–8.) The 2010 Agreement included an arbitration provision,

which states in relevant part:

> **Arbitration**. By requesting an Account from us and accepting this
> Agreement, you agree that if a dispute of any kind arises out of this
> Agreement, either you or we, at our sole discretion, can choose to have that
> dispute resolved by binding arbitration. If arbitration is chosen by any party
> . . . you will not have the right to participate as a representative or member
> of any class of claimants pertaining to any claim subject to arbitration.

(*Id.* at 7.)

---

[2]     Prior to Bluestem's partnership with WebBank in 2012, Bluestem similarly
partnered with MetaBank to offer credit to Fingerhut customers. (*Id.* ¶ 6.) When
Bluestem switched its financing partner from MetaBank to WebBank, WebBank
purchased all Fingerhut credit accounts from MetaBank. (*Id.* ¶ 6.)

[3]     Specifically, Plaintiffs Parm and Bowers applied for Fingerhut credit accounts on
Fingerhut's website on August 23, 2010, and January 23, 2011, respectively, and
Bluestem processed and approved their applications. (Svensen Decl. ¶¶ 7–8.) At the time,
Bluestem worked with MetaBank to finance the credit agreements.

The Agreement was updated in 2012, 2013,[4] and 2014.[5] The arbitration provisions in the 2012, 2013, and 2014 Agreements are identical. The current agreement, which has been in place since June 25, 2014, is the 2014 WebBank Fingerhut Advantage Credit Account Agreement (the "2014 Agreement"). (Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 1, BB App. 1–2.) The 2014 Agreement's arbitration provision states in relevant part:

> **Arbitration. Please review this provision carefully. It provides that any dispute may be resolved by binding arbitration. Arbitration replaces the right to go to court and the right to have a jury decide a dispute. Under this provision, your rights may be substantially limited in the event of a dispute. You may opt out of this Arbitration provision by following the instructions below.**
>
> By accepting this Agreement, unless you opt out by following the instructions below, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement or our relationship resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that dispute in court or to have a jury trial on that dispute . . . . In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any dispute subject to arbitration.

(*Id.*) The 2014 arbitration provision also describes what types of disputes are covered as follows:

> For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law,

---

[4]     Plaintiff Arce applied for a Fingerhut credit account over the phone on June 27, 2013, when the 2013 Agreement was in effect.

[5]     Plaintiff Osorio applied for a Fingerhut credit account on Fingerhut's website on August 28, 2014, when the 2014 Agreement was in effect.

intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes brought as counterclaims, cross claims, or third party claims . . . . Disputes brought as part of a class action or other representative bases are subject to arbitration on an individual (non-class, non-representative) basis. **IF YOU DO NOT OPT OUT, THEN YOU WILL HAVE WAIVED YOUR RIGHT TO INDICATE OR PARTICIPATE IN A CLASS ACTION RELATED TO THIS AGREEMENT.** In this Arbitration provision, the words "we," "us," and "our" shall include WebBank and any assignees of any of WebBank's rights, any merchant from which you purchased goods or services using your Account, as well as their respective affiliates, servicers, employees, agents, and further assigns.

(*Id.*)[6] All four Plaintiffs made purchases through the Fingerhut website or over the phone through a Fingerhut representative using their Fingerhut credit accounts after the 2014 Agreement went into effect.

Parm filed a Complaint in this District on August 27, 2015; Arce, Bowers, and Osorio filed a Complaint in the Central District of California on October 14, 2015, which was later transferred to this District on March 11, 2016. In both lawsuits, Plaintiffs claim that part of Fingerhut's retail prices for items are actually hidden finance charges. The basis for Plaintiffs' claim is the allegation that consumers who finance purchases on Fingerhut pay a higher cash price than consumers who make outright purchases on Gettington.com, a different Bluestem brand. Plaintiffs assert the higher sales prices on Fingerhut represent the cost of deferring payment, and are therefore finance charges. Plaintiffs claim that Bluestem violated various state usury, lending, and deceptive

---

[6]   Bluestem's records do not reflect that it received any opt-out communication from any of the Plaintiffs at any time. (Svenson Decl. ¶ 16.)

practices laws and the federal Truth in Lending Act. Plaintiff Arce also claims that Bluestem violated California state law regulating auto-renewal charges. All Plaintiffs also assert a common law claim for unjust enrichment.

On June 17, 2016, Bluestem filed a Consolidated Motion to Compel Arbitration and Dismiss Without Prejudice in both actions. (Case No. 15-3437, Doc. No. 72, and Case No. 16-624, Doc. No. 71.) On September 8, 2016, the matter was referred to the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3)(D). (Case No. 15-3437, Doc. No. 87, and Case No. 16-624, Doc. No. 86.) A hearing was held on the motion on December 2, 2016, at which all parties were represented by counsel. (Case No. 15-3437, Doc. No. 91, and Case No. 16-624, Doc. No. 90.)

## DISCUSSION

### I.      Standard of Review

The Federal Arbitration Act ("FAA" or "the Act"), 9 U.S.C. §§ 1-16, governs arbitration agreements relating to transactions involving interstate commerce. The Act provides:

> A written provision . . . or a contract evidencing a transaction involving commerce[7] to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

---

[7]      The parties do not dispute that the transaction here involves commerce for purposes of the FAA.

9 U.S.C. § 2. The Act establishes a "federal policy favoring arbitration," requiring that

courts "rigorously enforce agreements to arbitrate." *Shearson/Am. Express, Inc. v.*

*McMahon*, 482 U.S. 220, 226 (1987) (quotations omitted). "Generally, 'there is a

presumption of arbitrability in the sense that an order to arbitrate the particular grievance

should not be denied unless it may be said with positive assurance that the arbitration

clause is not susceptible of an interpretation that covers the asserted dispute.'"

*Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 433 (8th Cir. 1998)

(quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986))

(further internal quotations omitted); *see also Marmet Health Care Ctr., Inc. v. Brown*,

132 S. Ct. 1201, 1203 (2012) (stating that the FAA "reflects an emphatic federal policy in

favor of arbitral dispute resolution") (quotations omitted). When considering a motion to

compel arbitration, the Court is required to determine whether: (1) a valid agreement to

arbitrate exists between the parties; and (2) the specific dispute is within the scope of that

agreement. *See Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003); *Pro Tech*

*Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). The party seeking

arbitration bears the burden to establish the arbitration agreement applies. *See, e.g.*, *G.T.*

*Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 524 (Tex. 2015); *Jones v.*

*Jacobson*, 125 Cal. Rptr. 3d 522, 534 (Cal. Ct. App. 2011). "[T]he party resisting

arbitration bears the burden of proving that the claims at issue are unsuitable for

arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (citations

omitted).

## II.    Motion to Compel Arbitration

Bluestem argues that the Court should grant its motion to compel and enforce the agreements because all four Plaintiffs entered into agreements to arbitrate, the agreements cover the claims they have asserted, and the agreements are enforceable under the FAA. Plaintiffs oppose Bluestem's motion on three general grounds. First, they claim they have no arbitration agreement with Bluestem. Second, they make a related argument that the arbitration agreement does not cover their asserted claims relating to Bluestem's actions (*i.e.*, that Bluestem allegedly assesses "hidden finance charges disguised as massive price markups on exorbitantly priced electronics and household goods' to gouge its customers, all in violation of the Truth in Lending Act and state consumer protection and usury laws"). (Case No. 15-3437, Doc. No. 82, and Case No. 16-624, Doc. No. 81, Pls.' Mem. 1–2.) Third, Plaintiffs claim that even if there is a valid agreement and the dispute falls within the provisions of the agreement, the arbitration clause is unconscionable and illusory.

The parties have briefed and argued the issue of whether the different credit agreements apply or do not apply to some or all of the Plaintiffs. This Court need not go through the exercise of analyzing each agreement with each Plaintiff because both the 2010 and 2014 Agreements support Defendant's position. Further, it is undisputed that Plaintiffs did not sign an arbitration agreement with Bluestem. Plaintiffs, however, continued to make purchases from Fingerhut using their credit accounts even after the 2014 Agreement went into effect. Because this Court recommends compelling arbitration based on the 2010 Agreement for Parm and Bowers, and on the arbitration clause that

was incorporated into the 2014 Agreement for Arce and Osorio, this Court does not address whether the 2014 Agreement's arbitration clause applied to all four Plaintiffs. Nonetheless, this Court notes that courts have held that customers are bound by service agreements if they thereafter repeatedly accept services under that agreement. *See Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (stating that a customer "could not accept services he knew were being tendered on the basis of [the agreement] without becoming bound by that agreement"); *see also id.* at 520 (noting that because the terms of the agreement were available to the consumer on the service provider's website, they were therefore "binding, despite the fact that he was unaware of them"); *Comvest, L.L.C. v. Corp. Secs. Grp., Inc.*, 507 S.E.2d 21, 24–25 (Ga. Ct. App. 1998) ("[P]arties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other." (quotations omitted)). And as explained below, any questions of validity are reserved for the arbitrator. *See infra* pp. 28–32.

## A.     Non-Signatory Compelling Arbitration Against an Unwilling Signatory

The crux of Plaintiffs' argument is their assertion that Bluestem cannot compel arbitration of Plaintiffs' claims because none of the Plaintiffs agreed to arbitrate with Bluestem. The first question then is whether Bluestem—a non-signatory to all of the agreements—can rely on the arbitration clauses within the agreements to compel Plaintiffs to arbitrate their claims.

The Federal Arbitration Act "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). There is a strong federal policy in favor of arbitration agreements. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648 (quotations omitted). And state contract law governs the ability of non-signatories to enforce arbitration provisions. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 833 (8th Cir. 2010) (stating that for proceedings under the FAA, "state contract law governs the ability of non-signatories to enforce arbitration provisions"). "[A] litigant who was not a party to the relevant arbitration agreement may invoke § 3 [of the Federal Arbitration Act] if the relevant state contract law allows him to enforce the agreement." *Arthur Andersen*, 556 U.S. at 632.

Here, all four relevant states' laws in this case (Georgia for Parm; California for Arce; Texas for Bowers; and Florida for Osorio) follow the general rule that arbitration clauses are contractual and cannot be enforced by parties who are not parties to the contract, but also recognize exceptions to the rule, including the three principles that Defendant raises in which a non-signatory to a contract can compel arbitration – equitable estoppel, agency, and third-party beneficiary.[8] *See Autonation Fin. Servs. Corp.*

---

[8]     Because the Court recommends compelling arbitration on the basis of agency or

(Footnote Continued on Next Page)

*v. Arain*, 592 S.E.2d 96, 99 (Ga. Ct. App. 2003); *NORCAL Mut. Ins. Co. v. Newton*, 100

Cal. Rptr. 2d 683, 693 (Cal. Ct. App. 2000); *Glassell Producing Co. v. Jared Res., Ltd.*,

422 S.W.3d 68, 80–81 (Tex. App. 2014); *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp.

3d 1396, 1400–01 (S.D. Fl. 2014).

### i.    Alternative Estoppel Theory

A non-signatory may compel a signatory to arbitrate claims in limited

circumstances. *See, e.g.*, *PRM Energy Sys.*, 592 F.3d at 834. One such circumstance

"relies loosly on principles of equitable estoppel, broadly encompasses more than one test

for its application, and has been termed 'alternative estoppel.'" *Id.* (quoting *CD Partners,*

*LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005)); *see also CD Partners*, 424 F.3d at

799 ("A willing nonsignatory seeking to arbitrate with a signatory that is unwilling may

do so under what has been called an alternative estoppel theory which takes into

consideration the relationships of persons, wrongs, and issues . . ."). All four states' law

at issue here—Georgia, California, Texas, and Florida—allow for a nonsignatory to

enforce arbitration provisions under the principle of equitable estoppel. *See Gunson*, 43

F. Supp. 3d at 1400–01 (applying Florida law); *JSM Tuscany, LLC v. Superior Court*,

123 Cal. Rptr. 3d 429, 441 (Cal. Ct. App. 2011) (citing both California and federal law);

*Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305–06 (Tex. 2006) (applying Texas law);

---

(Footnote Continued from Previous Page)
equitable estoppel, it need not reach Defendant's arguments as to whether it is a third-party beneficiary.

*Price v. Ernst & Young, LLP*, 617 S.E.2d 156, 175–76 (Ga. Ct. App. 2005) (applying Georgia law).

Courts consistently hold that equitable estoppel allows a non-signatory to enforce arbitration provisions in an agreement against a signatory in two different circumstances: (1) "when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-signatory"; and (2) "when the signatory raises allegations of concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Gunson*, 43 F. Supp. 3d at 1401 (citing *Bailey v. ERG Enter.*, 705 F.3d 1311, 1321 (2013)); *see, e.g.*, *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)[9]; *see also*, *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (agreeing with the intertwined-claims doctrine formulated by the Eleventh Circuit in *MS Dealer* and citing other circuit court cases in accord). At a minimum, the first circumstance is apparent here.

The court in *MS Dealer* explained the reliance-on-agreement circumstance as follows:

> "[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes

---

[9]      *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) abrogated *MS Dealer* on the ground that *MS Dealer* did not make clear that state law governs the analysis. However, *MS Dealer* has since been relied on by several courts as consistent with state laws when analyzing equitable estoppel. *See, e.g.*, *Gunson*, 43 F.Supp. 3d at 1404 n.3; *Meyer*, 211 S.W.3d at 305–06; *Price*, 617 S.E.2d at 175–76.

the existence of the written agreement, the signatory's claims arise out of
and relate directly to the written agreement, and arbitration is appropriate.

*MS Dealer*, 177 F.3d at 947; *see, e.g.*, *Price*, 617 S.E.2d at 159–60; *see also*, *Goldman v.
KPMG LLP*, 92 Cal. Rptr. 3d 534, 540 (2009) ("[T]he *sine qua non* for application of
equitable estoppel as the basis for allowing a nonsignatory to enforce an arbitration
clause is that the claims the plaintiff asserts against the nonsignatory must be dependent
upon, or founded in and inextricably intertwined with, the underlying contractual
obligations of the agreement containing the arbitration clause.").[10]

Here, Plaintiffs have sued Bluestem for violations of various states' usury laws
and deceptive trade practices laws, violations of the Truth in Lending Act, and unjust
enrichment, based on their allegations that Defendant's massive price markups are
actually hidden finance charges. Plaintiffs rely on the credit agreements that Bluestem
and the banks partnered together on in asserting their claims against Bluestem. Plaintiffs
specifically allege the following in their Complaints:

- Plaintiffs obtained a WebBank Fingerhut Advantage Credit Account or a
  MetaBank Fingerhut Credit Account through either Bluestem's Fingerhut
  website or through Bluestem's Fingerhut customer phone line, and they made

---

[10]    Consistent with the estoppel theory, a non-signatory should be able to enforce an
arbitration clause against a signatory when the plain language of the arbitration clause
shows that the signatory intended for the arbitration clause to encompass claims asserted
by the signatory against that nonsignatory. *Cf. First Options of Chicago*, 514 U.S. 938,
947 (1995) ("[T]he basic objective in this area is not to resolve disputes in the quickest
manner possible, no matter what the parties' wishes . . . but to ensure that commercial
arbitration agreements, like other contracts, are enforced according to their terms.")
(quotations and citation omitted). As explained below, the plain language of the
arbitration agreements evidence an intent to include arbitration for claims that relate to
the credit agreements and the actions of third parties like Bluestem.

several purchases using the credit accounts. (Case No. 15-3437, Doc. No. 1 at ¶ 9; see Case. No. 16-624, Doc. No. 1 at ¶¶ 9, 11, 12.)

- "On information and belief, virtually all purchases on Fingerhut are made using Defendant's arranged financing." (Case No. 15-3437, Doc. No. 1 at ¶ 18; Case. No. 16-624, Doc. No. 1 at ¶ 21.)

- Bluestem's first communication with Plaintiffs was to direct them to a credit application option with the banks. (Case No. 15-3437, Doc. No. 1 at ¶ 37; Case. No. 16-624, Doc. No. 1 at ¶ 58.)

- On the Fingerhut website, "the prices are advertised based on the per month cost, thereby communicating to consumers that the product is being offered as a financed purchase." (Case No. 15-3437, Doc. No. 1 at ¶ 20; Case. No. 16-624, Doc. No. 1 at ¶ 23.)

- "[A]t the point of purchase, consumers are <u>defaulted</u> into using Defendant's arranged financing to pay for the purchase[.]" (Case No. 15-3437, Doc. No. 1 at ¶ 21; Case. No. 16-624, Doc. No. 1 at ¶ 24 (emphasis in original).)

- "Plaintiff and all members of the putative Classes were provided with Revolving Credit accounts." (Case No. 15-3437, Doc. No. 1 at ¶ 23; Case. No. 16-624, Doc. No. 1 at ¶ 26.)

- "The Revolving Credit Account features an Annual Percentage Rate ("APR") of 24.90%." (Case No. 15-3437, Doc. No. 1 at ¶ 24; Case. No. 16-624, Doc. No. 1 at ¶ 27.)

- "Adding insult to injury, Defendant charges another round of extremely high interest charges through the credit it arranges via its partners. Because the sales price is already inclusive of the hidden finance charge, Fingerhut is actually charging interest on interest, without disclosing this fact to consumers." (Case No. 15-3437, Doc. No. 1 at ¶ 29; Case. No. 16-624, Doc. No. 1 at ¶ 32.)

- "Defendant charges an annual interest rate of approximately 24.90%.[] This annual interest rate is driven even higher when the hidden finance charges are accounted for. These rates of interest are far in excess of the maximum" annual interest rates under Minnesota, Georgia, Texas, and Florida usury laws. (Case No. 15-3437, Doc. No. 1 at ¶ 30; Case. No. 16-624, Doc. No. 1 at ¶ 33.)

- "The markup on Fingerhut is actually a hidden finance charge. By not disclosing this finance charge, Defendant deceived consumers and violated the

14

Truth in Lending Act ('TILA'). Additionally, when this hidden finance charge is accounted for, Fingerhut loans feature interest rates far in excess of the allowable rate under both Georgia [Texas, Florida, and Minnesota] law." (Case No. 15-3437, Doc. No. 1 at ¶ 31; Case. No. 16-624, Doc. No. 1 at ¶ 34.)

- In order for Plaintiffs to pay the price offered by Bluestem for the merchandise, Plaintiffs applied for and used the credit account to finance the transaction. (Case No. 15-3437, Doc. No. 1 at ¶ 34; *see* Case. No. 16-624, Doc. No. 1 at ¶¶ 9, 11, 12, 44, 51, 55.)

Allegations relating to the credit agreements also appear in and are relied on within Plaintiffs' claims for relief. (*See, e.g.*, Case No. 15-3437, Doc. No. 1, Compl. at ¶¶ 52 ("Defendant's loans"), 59 ("consumer credit transaction"), 65 ("Defendant charged 24.90% interest"), 91 ("The Revolving Credit Accounts are 'open end credit plans'"); Case No. 16-624, Doc. No. 1, Compl. at ¶¶ 68 ("Defendant charged 24.90% interest" and "loans arranged by Defendant"); 75, 82 ("Defendant charged 24.90% interest"); 90, 99 ("Defendant charged more on Fingerhut—where consumers financed their purchases"); 154 ("The Revolving Credit Accounts are 'open end credit plans'"). And in every cause of action pleaded, Plaintiffs "repeat[] each and every allegation contained in the paragraphs above [in the Complaints] and incorporates such allegations by reference." (*See, e.g.*, Case No. 15-3437, Doc. No. 1, Compl. at ¶ 49; Case No. 16-624, Doc. No. 1, Compl. at ¶ 66.)

It is apparent that Plaintiffs relied on the credit agreements in making their claims against Bluestem. Plaintiffs cannot deny that their claims "makes reference to" or "presumes the existence of" the credit agreements. *See Gunson*, 43 F. Supp. 3d at 1401 ("[E]quitable estoppel applies when the signatory to the contract relies on the terms of the

contract to assert his or her claims against the non-signatory. In other words, arbitration is appropriate when the signatory's claim against a non-signatory 'makes reference to' or 'presumes the existence of' the agreement.") (citing *MS Dealer*, 177 F.3d at 947; *Armas v. Prudential Sec., Inc.*, 842 So.2d 210, 212 (Fla. 3d DCA 2003)). Also, like in *Gunson*, the agreements are the documents that facilitated the relationship between the banks and the Defendant. *See Gunson*, 43 F. Supp. 3d at 1402 (noting that "the Loan Agreements are the documents that create the relationship between the lenders and the Defendants"). Further, a reading of Plaintiff's Complaints shows that Plaintiffs' claims are both "founded in and inextricably intertwined with" the Fingerhut credit agreements. *See Goldman*, 92 Cal. Rptr. 3d at 540; *In LaSonde v. CitiFinancial Mtg. Co.*, 614 S.E.2d 224, 226 (2005) (estopping the non-signatory plaintiff from avoiding arbitration when the claims were were "so intertwined—and so dependent upon a contract containing an arbitration clause"); *Boucher v. All. Title Co., Inc.*, 25 Cal. Rptr. 3d 440, 447 (2005) ("Under these circumstances, plaintiff's claims against defendant are intimately founded in and intertwined with the . . . agreement; therefore, he is equitably estopped from avoiding arbitration of his causes of action against defendant."). Plaintiffs may not rely so heavily on the agreements and deny Bluestem the ability to invoke the arbitration clause of those same agreements. *See PRM Energy Sys.*, 592 F.3d at 835 ("Alternative estoppel typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement."); *see also Grigson*, 210 F.3d at 528 ("The linchpin for

equitable estoppel is equity—fairness."); *Gunson*, 43 F.Supp 3d at 1404 ("Gunson cannot rely on the interest rate on one page of the Loan Agreement to subject Defendants to liability while denying the applicability of the arbitration provision on the other page. Gunson cannot have it both ways.").

Finally, Plaintiffs argue that because they are not seeking to avail themselves of any benefits under the credit agreement, or are not asserting breach-of-contract claims, equitable estoppel does not apply. That argument fails. *See Gunson*, 43 F. Supp 3d at 1402 ("[Plaintiff's] "interpretation would require a breach of a contract claim before a non-signatory could ever invoke equitable estoppel and would be inconsistent with Florida law and Eleventh Circuit jurisprudence."); *see also MS Dealer*, 177 F.3d at 948 ("Although [plaintiff] does not allege that the service contract has been violated or breached in any way, each of her fraud and conspiracy claims depends entirely on her contractual obligation to pay $990.00 for the service contract."). Plaintiffs' claims do not need to seek to hold Defendant to any of the duties under the contract for the alternative estoppel exception to apply; their claims only need to rely on and relate to the credit agreements. *See Gunson*, 43 F.Supp 3d at 1402 (citing *Koechli v. BIP Intern., Inc.*, 870 So.2d 940, 945 (Fla. Dist. Ct. App. 2004) ("Because the basis of [plaintiff's] claims arise out of or are intimately related to the refurbishment agreement, it would be inequitable to allow [plaintiff] to both rely on the agreement in its action against non-signatories and selectively repudiate it when seeking to resist arbitration.")).

Again, one of the ways a non-signatory can enforce arbitration provisions in an agreement through equitable estoppel is "when the signatory to the contract relies on the

terms of the contract to assert his or her claims against the non-signatory." *Gunson*, 43

F.Supp. 3d at 1401. Examination of the claims asserted in Plaintiffs' Complaints is thus

instructive. *See, e.g.*, *Grigson*, 210 F.3d at 528–29 (stating the conclusion that the

arbitration agreement should be given effect "is compelled by comparing the complaint

(the operative facts for purposes of the motion to compel arbitration) with the distribution

agreement (an exhibit to the complaint)"). Although Plaintiffs would now like to distance

themselves from the credit agreements for the purpose of opposing this motion and

avoiding arbitration, neither the Plaintiffs, nor this Court, can ignore the facts and claims

asserted by Plaintiffs in Plaintiffs' Complaints.

Furthermore, this Court's conclusion that equitable estoppel applies is consistent

with the language of the credit agreements (that Plaintiffs voluntarily entered into), which

clearly contemplate that Plaintiffs agreed to arbitrate not just with the banks over their

actions that related to the agreements, but also with third parties. The agreements even

expressly reference purchases made with Fingerhut. Based on all of the above, Plaintiffs

are therefore estopped from denying that they must arbitrate their claims with an entity as

foreseeable as Bluestem/Fingerhut.[11]

---

[11] Because this Court concludes that the "relies on" test for equitable estoppel applies, the Court need not address whether the "concerted misconduct" test applies. *See MS Dealer*, 177 F.3d 942, 947 ("Existing case law demonstrates that equiable estoppel allows a nonsignatory to compel arbitration in two different circumstances."); *Interested Underwriters at Lloyd's v. M/T San Sebastian*, 508 F. Supp. 2d 1243, 1253 (N.D. Ga. 2007) (referencing the "two different circumstances"); *Chastain v. Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, 1077–1081 (C.D. Cal. 2007) (analyzing the "two different circumstances" separately); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003) (stating that the intertwined-claims test

(Footnote Continued on Next Page)

### ii.    Agency Exemption

A second, and related, circumstance where a non-signatory may compel a signatory to arbitrate claims "relies on agency and related principles . . . when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement." *PRM Energy Sys.*, 592 F.3d at 834 (citing *CD Partners*, 424 F.3d at 798–99); *see also In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) ("Several rules of law and equity may bind nonsignatories to a contract. For example, we have held that the principles of equitable estoppel and agency may bind nonsignatories to an arbitration agreement."); *Koechli*, 870 So.2d at 944 (stating a non-signatory agent should be permitted to compel arbitration in certain circumstances); *Autonation Fin. Servs.*, 592 S.E.2d at 99; *Qubty v. Nagda*, 817 So.2d 952, 958 (Fla. Dist. Ct. App. 2002) (citing *MS Dealer*, 177 F.3d at 947[12] (stating that a non-signatory may invoke agreement to arbitrate when, "under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by

---

(Footnote Continued from Previous Page)
requires "one of the two independent bases to be present when compelling arbitration.");
*Bloxom v. Landmark Pub. Corp.*, 184 F. Supp. 2d 578, 582 (E.D. Tex. 2002)
("[E]quitable estoppel allows a non-signatory to compel arbitration in two different circumstances."); (*Poole v. People's Choice Home Loan, Inc.*, No. 3:06-cv-327-J-33MMH, 2007 WL 865526, at *2–4 (M.D. Fl. Mar. 21, 2007) (analyzing the "two different circumstances" separately).

[12]     *MS Dealer* was abrogated on other grounds by *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009), which held that state law governs whether an arbitration clause is enforceable against a nonsignatory under the FAA.

permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided")); *In re Rolland*, 96 S.W.3d 339, 344 (Tex. Ct. App. 2001) ("A nonsignatory may enforce an arbitration agreement when under agency or related principles, the relationship between signatory and nonsignatory defendants is such that only by allowing the nonsignatory to require arbitration may the underlying agreement be preserved."); *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 832 (N.D. Cal. 2007).

"Agents of a signatory can compel the other signatory to arbitrate 'so long as (1) the wrongful acts of the agents for which they are sued related to their behavior as agents or in their capacities as agents (*Letizia*) and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause (*Britton*)." *Garcia v. Dell, Inc.*, 905 F. Supp. 2d 1174, 1177–78 (S.D. Cal. 2012) (quoting *Amisil*, 622 F. Supp. 2d at 832 (citing *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185 (9th Cir. 1986); *Britton v. Co-op Banking Grp.*, 4 F.3d 742 (9th Cir. 1993))); *see also Triad Health Mgmt. of Ga. v. Johnson*, 679 S.E.2d 785, 788 (Ga. Ct. App. 2009) ("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement.") (quotations omitted); *In re C.A.K.*, No. 04-08-00344-CV, 2009 WL 1800612, at *4 (Tex. Ct. App. June 24, 2009) ("A nonsignatory may compel arbitration of a signatory's claims that arise out of and relate directly to the agreement containing the arbitration clause.") (citing *Meyer*, 211 S.W.3d at 304); *Koechli*, 870 So.2d at 944 ("A non-signatory agent should be permitted to compel arbitration when the signatory to a written agreement containing an arbitration

clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory . . .") (quotations omitted).

This Court concludes that Bluestem was acting in the type of agency relationship with the banks that allows the agency exemption to apply.[13] It is undisputed that Bluestem was the servicer, facilitator, and promoter of the very credit agreements made with the banks that allowed for alleged over-priced purchases to be made by Plaintiffs (such purchases providing the underlying basis for all of Plaintiffs' claims). Further, Plaintiffs acknowledge the close relationship between Bluestem and the banks in their Complaints, even referring to the credit agreements as "Fingerhut loans" or "Defendant loans." (*See* Case No. 15-3437, Doc. No. 1 at ¶¶ 29, 31, 52; Case No. 16-624, Doc. No. 1

---

[13]    The common definition of agent is "[o]ne who is authorized to act for or in place of another[.]" *Black's Law Dictionary* 75 (10th ed. 2014). Plaintiffs have not shown that Bluestem was not acting as an agent of the banks, even though it is their burden to demonstrate that the claims at issue are unsuitable for arbitration. Instead, Plaintiffs contend that Bluestem and the banks were independent contractors. (Case No. 15-3437, Doc. No. 82, and Case No. 16-624, Doc. No. 81, Pls.' Mem. 6–7, 33–34, 40.) But the actions of Bluestem, and the agreements in the record, show that Bluestem was acting as an agent of the banks. (*See, e.g.*, Doc. No. 74, BB App. 546 ("All activities performed by Bluestem *as agent* for MetaBank will be performed . . . ") (emphasis added).) Further, independent contractors can in some circumstances also be agents. *See Royal Mortg. Corp. v. Montague*, 41 S.W.3d 721, 733 (Tex. App. 2001) (stating that Texas law allows an individual to be both an independent contractor and an agent); *Jennette v. Nat'l Cmty. Dev. Servs., Inc.*, 520 S.E.2d 231, 223 (Ga. Ct. App. 1999) ("[T]he fact that he was hired as an independent contractor is not dispositive . . . . the terms 'independent contractor' and 'agent' are nether antonyms nor mutually exclusive."); *Diaz v. Allstate Ins. Grp.*, 185 F.R.D. 581, 592 (C.D. Cal. 1998) ("[O]ne who contracts to act on behalf of another and is subject to the other's control, may be both an agent and an independent contractor."); *Potts v. Budget Rent a Car Sys., Inc.*, No. 4:04-CV-074-SPM, 2005 WL 3057175, at *4 (N.D. Fl. Nov. 2005) ("[A]n independent contractor can also be considered an agent.").

at ¶ 32 ("Adding insult to injury, Defendant charges another round of extremely high interest charges through the credit it arranges via *its partners*.") (emphasis added)); *see also* Case. No. 16-624, Doc. No. 1 at ¶ 9 (stating that "Plaintiff Arce obtained a WebBank/Fingerhut Advantage Credit Account through Defendant's Fingerhut customer phone line).) Plaintiffs also allege that it is Bluestem who sets the annual interest rate for the credit arrangement. (*See* Case No. 15-3437, Doc. No. 1 at ¶ 30; Case No. 16-624, Doc. No. 1 at ¶ 33 ("*Defendant charges* an annual interest rate of approximately 24.90%.") (emphasis added); *see also* Case No. 15-3437, Doc. No. 1 at ¶ 65 ("Defendant charged 24.90% interest . . .).) This Court therefore concludes that the acts Plaintiffs allege were wrongful by Bluestem (coaxing customers to purchase merchandise with undisclosed finance charges added into their prices) are related to the credit agreement contracts entered into by Plaintiffs and the banks. Without those credit agreements, the purchases would not have been made.

In addition, not only do the claims asserted by Plaintiffs relate to the agreements, but as explained above, Plaintiffs *rely* on the credit agreements in asserting its claims against Bluestem. Plaintiffs specifically allege in their Complaints that they obtained a WebBank Fingerhut Advantage Credit Account or a MetaBank Fingerhut Credit Account through either Bluestem's Fingerhut website or through Bluestem's Fingerhut customer phone line. They allege that Bluestem's first communication with Plaintiffs was to direct them to a credit application option with the banks; and in order for Plaintiffs to pay the price offered by Bluestem for the merchandise, Plaintiffs applied for the credit account to finance the transaction. Further, Plaintiffs alleged that on the Fingerhut website, "the

prices are advertised based on the per month cost, thereby communicating to consumers that the product is being offered as a financed purchase." (Case No. 15-3437, Doc. No. 1 at ¶ 20; Case. No. 16-624, Doc. No. 1 at ¶ 23.) Then "at the point of purchase, consumers are <u>defaulted</u> into using Defendant's arranged financing to pay for the purchase[.]" (Case No. 15-3437, Doc. No. 1 at ¶ 21; Case. No. 16-624, Doc. No. 1 at ¶ 24 (emphasis in original).) The plain reading of the Complaints shows that Plaintiffs' allegations were not only for factual context; the allegations are included in and are relied on within Plaintiffs' claims for relief. (*See, e.g.*, Case No. 15-3437, Doc. No. 1, Compl. at ¶¶ 52 ("Defendant's loans"), 59 ("consumer credit transaction"), 65 ("Defendant charged 24.90% interest"); Case No. 16-624, Doc. No. 1, Compl. at ¶¶ 68 ("Defendant charged 24.90% interest" and "loans arranged by Defendant"); 75, 82 ("Defendant charged 24.90% interest"); 90, 99 ("Defendant charged more on Fingerhut—where consumers financed their purchases").

Further, not only did Bluestem have a known close relationship with the signatory banks, and not only was Bluestem integral to the formation and servicing of the credit agreements that allowed for the purchases that underlie Plaintiffs' claims, but the plain language of the agreements also evidence an intent to include arbitration for claims that relate to the credit agreement and the actions of third parties like Bluestem, so much so that a failure to allow Bluestem to compel arbitration would eviscerate provisions in the arbitration agreements. The 2010 Agreement's arbitration provision states that "[a]ny claim, dispute or controversy . . . arising from or relating to the credit offered or provided to you; the actions of yourself, us, *or third parties*; . . . must . . . be resolved by binding arbitration [.]" (Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74,

Ex. 4, BB App. 7 (emphasis added).) The 2014 Agreement states that "[f]or purposes of this Arbitration provision, 'dispute' . . . shall include any claim, dispute or controversy . . . arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, *or third parties*." (Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 1, BB App. 1.) The 2014 Agreement's arbitration provision further states, "the words 'we,' 'us,' and 'our' shall include WebBank and any assignees of any of WebBank's rights, *any merchant* from which you purchased goods or services using your Account, as well as their respective affiliates, servicers, employees, agents, and further assigns." (*Id.* (emphasis added).)[14]

Further evidencing that the agreements, including the arbitration provisions, applied to claims involving Fingerhut/Bluestem, the agreements themselves were titled "MetaBank Fingerhut Credit Account Agreement" and "WebBank Fingerhut Advantage Credit Account Agreement." And the introductory paragraph in each agreement identifies the third party/merchant Fingerhut. The 2010 Agreement says:

> This is the Agreement which covers your credit account (called your "Account") with MetaBank ("MetaBank") for purchases you make with Fingerhut. You can use your Account to purchase goods and services from any Fingerhut authorized merchant and to pay for goods and services offered in connection with your Account. You and MetaBank will be bound by this Agreement from the first time you use the Account.

---

[14]   Plaintiffs focus on the terms "we," "us," and "our" from both the 2010 and 2014 Agreements, asserting that those terms related to the banks exclusively. However, Plaintiffs ignore the term "third parties" and other references to Fingerhut throughout the Agreements.

(Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 4, BB App. 7.)

The 2014 Agreement states as follows:

> This is the Agreement which covers your credit account (called your "Account") with WebBank for purchases you make with Fingerhut . . . . You can use your Account to purchase goods or services from Fingerhut or any merchant authorized to accept your Account, and to pay for goods and services offered in connection with your Account.

(Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 1, BB App. 1.)

Because meaning must be given to these words identifying third parties, merchants, and even Fingerhut, because Bluestem's alleged wrongful actions related to the agreements and Plaintiffs in fact rely on those agreements in making its claims against Bluestem, and because Bluestem was acting in an agency relationship with the banks when it was partaking in the alleged wrongful acts, Plaintiffs can be compelled by Bluestem, the non-signatory, to comply with the arbitration agreements under the agency exception. This conclusion is also fair in light of the fact that there were no surprises here. This was not a situation where the nonsignatory was a stranger to the Plaintiffs or where the agreements made no mention of them. *See PRM Energy Sys.*, 592 F.3d at 836 (stating it was "not a situation . . . where the nonsignatory co-conspirator '[was] a complete stranger to the plaintiffs' . . . agreements[,] . . . did not sign them, . . . is not mentioned in them, and . . . performs no function whatsoever relating to their operation'"); *see also Gunson*, 43 F. Supp. 3d at 1403 (holding that the defendants could enforce the arbitration clauses and noting that the third party was "foreseeable"). Instead, the credit agreements that Plaintiffs agreed to anticipated that Plaintiffs might have a

claim related to their purchasing against an entity such as Fingerhut/Bluestem. Thus, it is

another reason why compelling arbitration in this circumstance is appropriate.

### B.     Scope

Next, Plaintiffs argue that the arbitration agreement does not cover their asserted

claims relating to Bluestem's actions. Parties may specify in the contract the issues

subject to arbitration and the rules under which arbitration is conducted. *Volt Info. Scis.,*

*Inc. v. Bd. of Trs. of Leland Stanford Univ.*, 489 U.S. 468, 479 (1989). "[I]n applying

general state-law principles of contract interpretation to the interpretation of an

arbitration agreement within the scope of the Act, see *Perry v. Thomas,* 482 U.S. 483,

493, n. 9, . . . (1987), due regard must be given to the federal policy favoring arbitration,

and ambiguities as to the scope of the arbitration clause itself resolved in favor of

arbitration." *Id.* at 475–76. In determining whether claims come within the scope of an

arbitration provision, "the district court does not reach the potential merits of any claim

but construes the clause liberally, resolving any doubts in favor of arbitration and

granting the motion [to compel arbitration] unless it may be said with positive assurance

that the arbitration clause is not susceptible of an interpretation that covers the asserted

dispute." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008) (quotations

omitted); *see also Medcam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005) (stating that

a motion to compel arbitration should be granted if the arbitration clause is "susceptible

of an interpretation that covers the asserted dispute").

Here, the arbitration agreements contain very broad and unequivocal scope-of-

disputes provisions. (*See* Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc.

No. 74, Ex. 4, BB App. 7 (the 2010 Agreement) ("Any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to the credit offered or provided to you; the actions of yourself, us, or third parties; or the validity of this Arbitration provision . . . must . . . be resolved by binding arbitration . . ."); Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 1, BB App. 1 (the 2014 Agreement) ("For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes brought as counterclaims, cross claims, or third party claims . . .").) By using this inclusive language, the parties agreed to arbitrate any and all claims relating to the agreements, the credit offered, or the actions of third parties, with no exceptions. Given the strong federal policy favoring arbitration, and the broad language in the arbitration agreements, this Court concludes that Plaintiffs' pleaded claims do fall within the scope of the 2010 and 2014 Agreements and they therefore agreed to arbitrate those claims.

###        C.        Whether the Arbitration Clause is Unenforceable

Plaintiffs assert that the WebBank Credit Account Agreement (*i.e.*, the 2014 Agreement)[15] is unenforceable because it is both procedurally and substantively unconscionable and because it is illusory. Specifically, Plaintiffs argue the 2014 Agreement is procedurally unconscionable because of the disparity in bargaining power between Plaintiffs and the banks and because the terms and conditions of the WebBank Agreement were broad and not explained to Plaintiffs. Plaintiffs argue the 2014 Agreement is substantively unconscionable because the term "merchant" is unlimited and therefore the number of parties allowed to invoke the arbitration clause is unknown, and because the arbitration clause is, according to them, unilateral. Plaintiffs assert the 2014 Agreement is illusory because "WebBank retains the authority to unilaterally modify the terms of the Credit Account Agreement at any time." (Case No. 15-3437, Doc. No. 82, and Case No. 16-624, Doc. No. 81, Pls.' Mem. 51.) Defendant disagrees that the agreement is unconscionable or illusory, and also asserted at the hearing that pursuant to the agreements any issues of enforceability must be reserved for the arbitrator.

Although neither party focused on Defendant's later argument, it is apparent that the 2014 Agreement contains a delegation clause.[16] The 2014 Agreement describes what types of disputes are covered by the arbitration provision as follows:

---

[15]     Plaintiffs limit their argument to the 2014 Agreement, and make no mention of the 2010 Agreement or its provisions in this section of their memorandum.

[16]     The Court notes that the 2010 Agreement also contains a delegation clause. The 2010 Agreement states that "the validity of this Arbitration provision . . . must, after an

(Footnote Continued on Next Page)

> For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; *or the validity of this Agreement or this Arbitration provision*.

(Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 1, BB App. 1 (emphasis added).) This language constitutes clear and unmistakable evidence that the parties agreed that the arbitrator would decide validity issues.

Determinations of whether an agreement is procedurally or substantively unconscionable or illusory are validity determinations. *See Sanchez v. Carmax Auto Superstores California, LLC*, 168 Cal. Rptr.3d 473, 477 (Cal. Ct. App. 2014) ("The agreement is invalid if it is both procedurally and substantively unconscionable."); *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006) ("[Substantive and procedural unconscionability] issues are properly considered by courts in determining the validity of an arbitration provision."); *IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 808 (Tex. Ct. App. 2012) (concluding the determination of whether the agreement is illusory was for the arbitrator because it was an issue of validity and enforceability). Under the FAA, where an agreement to arbitrate includes an agreement that the arbitrator will determine the enforceability or validity of the agreement, the

---

(Footnote Continued from Previous Page)
election by you or us, be resolved by binding arbitration." (Case No. 15-3437, Doc. No. 75, and Case No. 16-624, Doc. No. 74, Ex. 4, BB App. 7.)

district court will consider a challenge if the challenge is to that very agreement for the arbitrator to determine the enforceability or validity of the agreement. *Rent-A-Center, W., Inc., v. Jackson*, 130 S. Ct. 2772, 2779 (2010); *Garcia*, 905 F. Supp. 2d at 1178. But "if a party challenges the enforceability [or validity] of the agreement as a whole, the arbitrator considers the challenge." *Garcia*, 905 F. Supp. 2d at 1178 (citing *Rent-A-Center*, 130 S. Ct. at 2779); *see also IHS Acquisition*, 387 S.W.3d at 807 ("An arbitration provision may give the arbitrator the power to resolve gateway issues regarding validity and enforceability of the arbitration agreement. In that event, the entire matter of arbitrability is transferred from the courts to the arbitrator.").

The Supreme Court has explained that "unless [the party opposing arbitration] challenged the delegation provision specifically, we must treat [the delegation provision] as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Rent-A-Center*, 130 S. Ct. at 2779; *see also IHS Acquisition*, 387 S.W.3d at 807 ("Arbitration agreements that clearly and unmistakably show intent to assign gateway issues to the arbitrator are fully enforceable."). Both courts in *Rent-A-Center* and *Garcia* looked to the parties' opposition to the motion to compel arbitration to determine whether a challenge had been made to the delegation provision or to the entire arbitration agreement. *Id.*; *see Garcia*, 905 F. Supp. 2d at 1178–79. In both cases, the opposing party had not specifically challenged the delegation clause in their oppositions. *Rent-A-Center*, 130 S. Ct. at 2779; *Garcia*, 905 F. Supp. 2d at 1179. The same is true here. Plaintiffs do not challenge the delegation clause in their opposition to the motion to compel arbitration. Instead, they challenge the

validity or enforceability of the 2014 Agreement as a whole. (*See* Case No. 15-3437,

Doc. No. 82, and Case No. 16-624, Doc. No. 81, Pls.' Mem. 45 ("[T]he WebBank Credit

Agreement . . . was procedurally unconscionable . . ."); 46 ("[T]he terms and conditions

of the WebBank Agreement were not explained to Parm . . ."); 46 ("Like Parm, Bowers

was not informed of either the existence or scope of the WebBank Agreement generally,

or its arbitration provision specifically."); 46 ("Osorio was not afforded an opportunity to

negotiate the credit agreement."); 47 (". . . the WebBank Credit Account Agreement is

procedurally unconscionable."); 49 ("This grant of unfettered, unilateral power

unreasonably favors Bluestem, and conclusively establishes the substantive

unconscionability of the arbitration provision."); 50 ("For the reasons discussed above,

the arbitration clause is substantively unconscionable as to Arce."); 51 ("Because

WebBank retains the authority to unilaterally modify the terms of the Credit Account

Agreement at any time, it is illusory and unenforceable."). There is no argument, nor any

mention of, the delegation clause in Plaintiffs' opposition. Accordingly, under *Rent-A-*

*Center*, the delegation clause of the agreements should be enforced and any issue of

validity or enforceability should be decided by an arbitrator. *See Rent-A-Center*, 130 S.

Ct. at 2779; *Garcia*, 905 F. Supp. 2d at 1179; *Allied Prof'ls Ins. Co. v. Fitzpatrick*, 169

So.3d 138, 141 (Fla. Dist. Ct. App. 2015) ("Because the plaintiffs did not challenge the

delegation provision specifically, the delegation provision remains enforceable as a

matter of law."); *Losey v. Prieto*, 739 S.E.2d 834, 836 (Ga. Ct. App. 2013) (affirming

arbitration "because the parties specifically agreed in the Fee Agreement to arbitrate any

dispute arising out of the agreement, including the enforceability of the arbitration provision.").[17]

   For all of the reasons stated above and because the Federal Arbitration Act, 9 U.S.C. § 4, requires a district court to order the parties "to proceed to arbitration in accordance with the terms of the agreement," this Court recommends ordering the parties to proceed to arbitration.

## RECOMMENDATION

   Based on the file, and all the records and proceedings therein, and for the reasons stated, **IT IS HEREBY RECOMMENDED** that:

   1.   Defendant's Consolidated Motion to Compel Arbitration and Dismiss Without Prejudice (Case No. 15-3437, Doc. No. 72; Case No. 16-624, Doc. No. 71) be **GRANTED**; and

---

[17]   Because these "gateway" issues of contract validity must be reserved for the arbitrator under the agreement, the Court should not address the merits of whether the 2014 Agreement is unconscionable or illusory. However, the Court notes that if it were to entertain that analysis, it would conclude, for the reasons provided in Defendant's reply memorandum, that neither the 2010 nor 2014 Agreements were procedurally or substantively unconscionable or illusory. (*See* Case No. 15-3437, Doc. No. 86, and Case No. 16-624, Doc. No. 85, Def.'s Reply 15–19.)

2.      Case No. 15-3437 and Case No. 16-624 be **DISMISSED** without

prejudice.[18]

Date:  January 10, 2017

*s/ Becky R. Thorson*

BECKY R. THORSON
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **January 24, 2017**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.

---

[18]      Plaintiffs did not oppose Defendant's request to have the cases dismissed without prejudice rather than stayed. *See also Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769–70 (8th Cir. 2011) (stating that the court may, in its discretion, "dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration").