# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

**Civil No. 15-3437 (JRT/BRT)**

JESSICA PARM,

Plaintiff,

v.

BLUESTEM BRANDS, INC.,

Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Civil No. 16-624 (JRT/BRT)**

SARA ARCE, ANNE BOWERS, and
NENA OSORIO,

Plaintiffs,

v.

BLUESTEM BRANDS, INC.,

Defendant.

**MEMORANDUM OPINION
AND ORDER ON REPORT AND
RECOMMENDATION OF
MAGISTRATE JUDGE DATED
JANUARY 10, 2017**

Charles D. Moore and Melissa W. Wolchansky, **HALUNEN LAW**, 1650 IDS Center, 80 South Eighth Street, Minneapolis, MN  55402, and Jeffrey D. Kaliel, **TYCKO & ZAVAREEI LLP**, 1828 L Street N.W., Suite 1000, Washington, D.C.  20036, for plaintiffs.

Aaron D. Van Oort, Erin L. Hoffman, and Aaron Knoll, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN  55402, for defendant.

Plaintiffs Jessica Parm, Sarah Arce, Anne Bowers, and Nena Osorio (collectively,

"Plaintiffs") are consumers who purchased goods from Defendant Bluestem Brands, Inc.

("Bluestem") through a catalog and online retailer Bluestem operates that goes by the name of "Fingerhut."   Plaintiffs challenge the legality of a number of Bluestem's practices related to pricing of goods and the interest rates and disclosures regarding private-label revolving credit accounts.   Arguing that arbitration provisions found in the terms and conditions governing the private-label revolving credit accounts are applicable to all of Plaintiffs' claims, Bluestem moves to compel arbitration and to dismiss Plaintiffs' claims without prejudice, or in the alternative, to stay Plaintiffs' claims pending arbitration.

The Court will grant Bluestem's motion in part because the Court finds that some of Plaintiffs' claims arise out of or relate to the applicable credit agreements and/or Plaintiffs' relationship with the banks providing the credit.   However, the Court will deny Bluestem's motion as to Plaintiffs' claims alleging that Bluestem's pricing scheme is unlawful, since Bluestem sets the prices for goods it sells wholly unrelated to the credit agreements – between Plaintiffs and the banks providing the credit – that contain the arbitration provisions.

## BACKGROUND

## I.   FACTUAL BACKGROUND

### A.   Bluestem and the Banks

Bluestem, which does business under a number of names – including "Fingerhut" – is a consumer retail business incorporated in Delaware with its principal place of business in Minnesota.   (*Parm* Decl. of Erik Svensen in Supp. of Def.'s Consol. Mot.

("Svensen Decl.") ¶ 4, June 17, 2016, Docket No. 76.)[1]  Fingerhut "provide[s] a mix of retail and payment options to customers across the United States through direct mail and Internet shopping channels."  (*Id.*)

Financing is available through a partnership between Fingerhut and a third-party bank, which allows customers to pay for their purchases from Fingerhut with private-label revolving credit accounts.[2]  (*Id.* ¶¶ 5-6.)  The offers for credit are made available on Fingerhut's website and in Fingerhut catalogs; customers may apply for a revolving credit account on Fingerhut's website or over the phone.  (*Id.* ¶ 5; *Parm* App. to Def.'s Mem. of Law in Supp. of Consol. Mot. ("App.") at 112-13, 270, 324-31, 462-63, June 17, 2016, Docket No. 75.)  Prior to mid-2012, Bluestem partnered with MetaBank, an FDIC-insured bank headquartered in South Dakota, to offer credit to Fingerhut customers.  (Svensen Decl. ¶ 6.)  Bluestem subsequently switched its financing partner from MetaBank to WebBank,[3] an FDIC-insured bank headquartered in Utah, and on July 1, 2012, WebBank purchased all Fingerhut credit accounts from MetaBank.  (*Id.* ¶¶ 5-6.)  At all relevant times, the Banks lent money to consumers and collected interest on credit balances from consumers.  (*Id.* ; App. at 504-11; *Parm* Decl. of Melissa W. Wolchansky ("Wolchansky Decl."), Ex. 5 at BLUESTEM000820-27, July 15, 2016, Docket No. 83.)

---

[1] Unless otherwise noted, docket entries in *Parm v. Bluestem Brands, Inc.*, Civil No. 15-3437, are denoted by the term "*Parm*," while docket entries in *Arce v. Bluestem Brands, Inc.*, Civil No. 16-624, are denoted by the term "*Arce*."

[2] The revolving credit accounts are also accepted by a limited number of other merchants.

[3] The Court refers to MetaBank and WebBank, collectively, as the "Banks."

Bluestem, through a contract with the Banks, "serviced" the revolving credit accounts, meaning that Bluestem communicated with consumers, advertised and made the offers of credit to consumers, accepted consumers' credit applications, reviewed those applications to determine whether the consumers met the underwriting criteria, sent out bills to consumers, accepted payment from consumers, and dealt with all disputes with consumers. (Svensen Decl. ¶¶ 5-6; App. at 105-06, 504-11, 545-51; Wolchansky Decl., Ex. 5 at BLUESTEM000820-27.) Bluestem retained control of selecting merchandise sold on Fingerhut's website and in its catalogs, setting prices, and selling that merchandise. (App. at 106-07.)

As part of Bluestem's agreement with the Banks, at all relevant times Bluestem agreed to offer and promote a "debt waiver product," known as SafeLine Account Protection ("SafeLine"), on the Banks' behalf. (*Id.* at 510-11, 586-92, 596-99; Wolchansky Decl., Ex. 5 at BLUESTEM000821-22.) For a monthly fee charged to an account-holder's revolving credit account, an account-holder enrolled in SafeLine becomes eligible for suppression of the credit account in the event of unemployment or disability and waiver of the entire outstanding balance in the event of death. (*Id.* at 586-87.)

Fingerhut's catalogs and website list prices for goods in two ways: (1) a total price, and (2) a monthly payment. (*See, e.g.*, *Parm* Compl. ¶ 20, Aug. 27, 2015, Docket No. 1; *Arce* Compl. ¶¶ 23-24, Oct. 14, 2015, Docket No. 1; App. at 273-385.) A sample Fingerhut catalog from July 2013 states that any given advertised monthly price "includes

interest and assumes you have a Fingerhut Credit Account issued by [the Banks] and will vary depending on your account balance and other factors."  (App. at 274.)

## B.    Credit Agreements

At all relevant times, the Banks' revolving credit accounts have been governed by credit agreements between the applicable Bank (MetaBank before 2012, WebBank after 2012) and the account-holder.  (*Id.* at 1-8.)  Each credit agreement provided that it would go into effect at the time the account-holder's first transaction was posted to their account.  (*Id.* at 1, 3, 5, 7.)

The terms of the credit agreements have evolved over time.  The earliest relevant agreement is the MetaBank Fingerhut Credit Account Agreement (the "2010 Agreement"), which became effective in August 2010.  (*Id.* at 7-8.)  The credit agreement was updated first in 2012, when MetaBank sold all of its accounts to WebBank; the new agreement, titled the WebBank Fingerhut Credit Account Agreement (the "2012 Agreement"), became generally effective July 1, 2012.  (*Id*. at 3-4.)  The agreement was updated again on March 7, 2013 (the "2013 Agreement") and June 25, 2014 (the "2014 Agreement").[4]  (*Id.* at 1-2, 5-6.)  Each of the credit agreements contains an arbitration provision as well as a provision permitting the Banks to unilaterally change terms at any time.  (*Id.* at 1-8.)

---

[4] The official title of the 2013 Agreement is the same as the 2012 Agreement, (App. at 3, 5); the 2014 Agreement's full title is WebBank Fingerhut Advantage Credit Account Agreement, (*id.* at 1).

### C.      Fingerhut Terms of Use

Separate from the credit agreements, Fingerhut's website has Terms of Use, which are "the terms on which [a consumer] may purchase products and services through [the Fingerhut website]." (Wolchansky Decl., Ex. 1 at 56:5-15.)  The Terms of Use state:

> **Your Use of This Website and Fingerhut Affiliated Websites is Governed by These Terms of Use**
>
> . . . Your use of this website or other Fingerhut affiliated websites (collectively, the "Site") constitutes your agreement to follow these Terms of Use and to be bound by them. . . .
>
> . . . .
>
> **Use of This Site**
> By using this Site and accepting these Terms of Use, you certify that you are 18 years of age or older. . . . By confirming your purchases at the end of the checkout process, you are agreeing to accept and pay for the items purchased.

(*Id.*, Ex. 2 at 12-13.)  The Terms of Use do not mention arbitration.  (*Id.*)

### D.      Plaintiffs' Revolving Credit Accounts

Plaintiffs Parm, Arce, Bower, and Osorio are citizens of Georgia, California, Texas, and Florida, respectively.  Each Plaintiff was at one time a Fingerhut customer who utilized a revolving credit account from WebBank and/or MetaBank to pay for their Fingerhut purchases.

### 1.      Parm and Bowers

On August 23, 2010, Parm applied for and was approved for a credit account from MetaBank on Fingerhut's website.  (App. at 22, 27-28, 38-39.)  On January 23, 2011, Bowers also applied for a credit account on Fingerhut's website.  (Svensen Decl. ¶ 7.)

- 6 -

Parm's and Bowers's applications were approved based on MetaBank's criteria.  (*Id.* ¶¶ 7-8.)  As part of the application process, Parm and Bowers selected a box indicating that they accepted the applicable terms.  (App. at 112-13.)  Subsequently, Bluestem sent Parm and Bowers a Welcome Packet in the mail, including a paper copy of the 2010 Agreement.  (*Id.* at 181-92.)

MetaBank sold Parm's and Bowers's credit accounts to WebBank in 2012.  To notify Parm and Bowers of the change, Bluestem sent a letter in the mail.  (*Id.* at 69-70, 233-35.)  The letter did not mention any new terms and conditions nor did it mention arbitration.[5]  (*Id.* at 233.)  While Bluestem posted a link in the footer of the Fingerhut website to the "Revolving Fingerhut Credit Account <u>Terms and Conditions</u>" on October 24, 2012, (Svensen Decl. ¶ 11), Bluestem did not send a hard copy of the 2012 Agreement to Parm or Bowers.

---

[5] The letter stated, in relevant part:

This change will not affect your existing balance, future purchase, or how you use your account.  Here's what you need to know:

- Your account number will remain the same

- Payment methods, including online functions, remain the same

- If you have SafeLine® Account Protection Plus or SafeLine Account Protection, your Fingerhut Credit Account will be protected to the full extent of the plan

- The WebBank Privacy Notice is enclosed for your review

- Statements and other account correspondence will begin to reference your Fingerhut Credit Account issued by WebBank beginning July 1, 2012.

(App. at 233.)

In December 2012, before the 2013 Agreement went into effect, Bluestem sent Bowers a document titled "Important Changes to Your Account Terms," as a second page to her monthly billing statement.  (App. at 236-37.)  This document discussed only changes in the interest rate and late fees and contained no mention of arbitration.  (*Id.*)  Bluestem did not send a similar notice to Parm.

Before the 2014 Agreement went into effect, Bluestem sent Parm a written notice with her monthly billing statement in April 2014 that highlighted "Important Changes to Your Account Terms."  (*Id.* at 477.)  This document listed only changes in late fees, returned payment fees, and minimum monthly payments, and it stated: "You do not have the right to reject these changes to your Account."  (*Id.*)  In May 2014, Bluestem sent Bowers a letter informing her of "changes and updates related to [her] account."  (*Id.* at 478.)  The letter provided Bowers with a new account number.  (*Id.*)  It also stated: "Enclosed are the Fingerhut Privacy Policy, the WebBank Privacy Policy, and changes to your WebBank/Fingerhut Credit Account.  Please review this important information and note any changes that may affect your account.  If you have any questions, more information is available on www.fingerhut.com."  (*Id.*)[6]

Parm and Bowers made their first purchases on Fingerhut's website using their revolving credit accounts on August 23, 2010 and January 23, 2011, respectively.  (*Id.* at

---

[6] The parties have not provided copies of the documents attached to the 2014 letter sent to Bowers, and thus, it is not clear what "changes to your WebBank/Fingerhut Credit Account" were included in the notice.  However, the Court notes that while the letter states that copies of two privacy policies were enclosed, the letter does not state that a copy of the 2014 Agreement was enclosed.

33, 38-39, 128-29; Svensen Decl. ¶ 7.)  Subsequently, Parm and Bowers made numerous purchases on Fingerhut's website, using their revolving credit accounts, until Parm made her last purchase in June 2014 and Bowers made her last purchase in July 2015.  (App. at 193-227, 479-91; Svensen Decl. ¶¶ 9-10, 14-15.)

### 2.   Arce

On June 27, 2013, Arce applied for revolving credit account over the phone after receiving a Fingerhut catalog that included a prescreened offer of credit as well as a summary of credit disclosures that explained that the applicable terms and conditions would include an arbitration provision.  (App. at 325-26, 389, 425.)  During the phone call, Arce verbally agreed to "the summary disclosures of the credit terms as stated in the catalog."  (*Id.* at 393.)  Arce also provided verbal consent to be enrolled in SafeLine.  (*Id.* at 396-99.)

After Arce placed her first order – during the same call in which she applied for the credit account – Bluestem sent her a Welcome Packet containing the 2013 Agreement.  (*Id.* at 400-04, 417-24.)  Subsequently, Arce made a number of purchases from Fingerhut over the phone until she made her last purchase in January 2015.  (*Id.* at 494-99.)

### 3.   Osorio

On August 28, 2014, Osorio applied for a credit account on Fingerhut's website. (*Id.* at 435-37, 472.)   At the bottom of the application, there was a section titled "Fingerhut Credit Terms & Conditions."  (*Id.* at 463.)  Below that was a link titled "Print

Fingerhut Terms & Conditions." (*Id.*)  The print link brought Osorio to a webpage with a summary of some terms of the 2014 Agreement. (*See* Wolchansky Decl., Ex. 11.)  The summary stated, among other things, that a full version of the terms and conditions would be provided.  (*Id.*, Ex. 10 at 39-41.)  Arce selected a box indicating that she accepted the applicable terms.  Osorio's application was approved based on WebBank's criteria, and Bluestem subsequently mailed Osorio a Welcome Packet containing a paper copy of the 2014 Agreement.  (App. at 464-72.)  Osorio subsequently made purchases on Fingerhut's website using her revolving credit account, with her latest purchase taking place in July 2015.  (Svensen Decl. ¶ 13; App. at 473-76.)

## II.   PROCEDURAL HISTORY

Parm filed her class-action complaint in this District on August 27, 2015.  (*Parm* Compl., Aug. 27, 2015, Docket No. 1.)  Arce, Bowers, and Osorio filed their class-action complaint in the Central District of California on October 14, 2015.  (*Arce* Compl., Oct. 14, 2015, Docket No. 1.)  Plaintiffs seek monetary damages, restitution, declaratory and injunctive relief, and attorney fees and costs on behalf of themselves and those similarly situated.  (*Parm* Compl. at 24-25; *Arce* Compl. at 39.)  Plaintiffs claim that Bluestem has violated a number of statutes, including state laws governing usury and deceptive trade practices and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, based on the allegation that Bluestem charges finance charges that exceed maximum statutory limits and that Bluestem did not properly disclose to Plaintiffs.  (*Parm* Compl. ¶¶ 49-77, 88-104; *Arce* Compl. ¶¶ 66-115, 151-83.)  In support, Plaintiffs allege that when they

purchased goods from Fingerhut, the prices for goods advertised on Fingerhut's website and in its catalogs were inflated, and that this inflated price included a hidden finance or interest charge.[7]  (*E.g.*, *Parm* Compl. ¶¶ 52, 58; *Arce* Compl. ¶¶ 110, 180.)  In addition, Plaintiffs assert common-law unjust enrichment claims.  (*Parm* Compl. ¶¶ 78-87; *Arce* Compl. ¶¶ 184-93.)   Lastly, Arce asserts that the operation of SafeLine violates California's Auto-Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*, and California's Unfair Competition Law.  (*Arce* Compl. ¶¶ 116-50.)

In March 2016, *Arce v. Bluestem Brands, Inc.* was transferred to this District.  (*See Arce* Min. Order Granting Def.'s Mot. to Transfer, Mar. 10, 2016, Docket No. 35.)  On April 15, 2016, United States Magistrate Judge Becky R. Thorson issued a scheduling order setting out a timeline for consolidated proceedings in the two cases.  (*Parm* Pretrial Scheduling Order, Apr. 15, 2016, Docket No. 51.)[8]

The parties completed limited discovery on the questions of contract formation and enforceability.  Bluestem then moved to compel arbitration and dismiss without prejudice (or in the alternative to stay litigation pending arbitration) on June 17, 2016.[9]

---

[7] Plaintiffs allege that Bluestem sells many of the same items on another of its websites – Gettington.com – which targets consumers with higher incomes and credit scores, whereas Fingerhut targets consumers with lower incomes and credit scores.  (*Parm* Compl. ¶ 5.)  Plaintiffs allege that at the time they purchased certain goods from Fingerhut, the same items sold for much lower prices on Gettington.com, and the inflated prices of goods from Fingerhut represent the true price of the goods plus "hidden" finance charges.  (*Id.* ¶ 6.)

[8] After this scheduling order, the parties filed largely identical documents in the two consolidated matters, though they were filed on different dockets with different docket numbers.

[9] Although Bluestem's motion did not explicitly invoke the Federal Rules of Civil Procedure, the Court construes the instant motion as filed pursuant to Fed. R. Civ. P. 12(b)(1) for

(Footnote continued on next page.)

In response, Plaintiffs argued that there is no applicable contract with an arbitration provision that Bluestem may invoke, and in the alternative, even if there is an applicable arbitration provision, Bluestem is a nonsignatory to those agreements and cannot invoke the arbitration provisions therein.  Plaintiffs also argued that the arbitration clauses in the credit agreements are unconscionable.

After a hearing, the Magistrate Judge issued an R&R recommending that the Court grant Bluestem's motion.  (*Parm* R&R ("R&R"), Jan. 10, 2017, Docket No. 94)  The Magistrate Judge recommended compelling arbitration for Parm and Bowers based on the 2010 Agreement and for Arce and Osorio based on the 2014 Agreement.  The Magistrate Judge concluded that under applicable state law, as a non-signatory to the credit agreements, Bluestem may compel arbitration under either a theory of equitable estoppel or agency.  (*Id.* at 11-18 (equitable estoppel); *id.* at 19-26 (agency).)  The Magistrate Judge further concluded that Plaintiffs' claims are within the scope of the relevant arbitration clauses, which "contain very broad and unequivocal scope-of-disputes

_____

(Footnote continued.)

lack of subject-matter jurisdiction.  5C Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1360 (3d ed 2017) ("A motion to stay . . . may be justified [under Rule 12(b)] when a similar action is pending in another court or when remitting the matter to arbitration is appropriate." (footnotes omitted)); *see United States ex rel. Lighting & Power Servs. v. Interface Constr. Corp.*, 553 F.3d 1150, 1152 (8th Cir. 2009) (permitting treatment of a motion to compel arbitration as a motion under Rule 12(b)(1)); *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017-18 (D. Minn. 2015) (same).  The Court may consider matters beyond the pleadings in resolving such motions.  *E.g.*, *Deuser v. Vecera*, 139 F.3d 1190, 1191 n.3 (8th Cir. 1998).

provisions." (*Id.* at 26-27.) Plaintiffs subsequently filed objections to the R&R (*Parm Pls.' Objs.to R&R ("Objs."), Jan. 24, 2017, Docket No. 100.*).[10]

# ANALYSIS

## I.    STANDARD OF REVIEW

After a magistrate judge files an R&R, a party may "file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b)(1). "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008). On a dispositive motion the Court **must** review "properly objected to" portions of an R&R de novo and otherwise **may** "accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3).

## II.    DISCUSSION

As evidenced by the Federal Arbitration Act ("FAA"), there is a strong federal policy in favor of enforcing arbitration agreements. *Moses H. Cone Mem'l Hosp. v.*

---

[10] Plaintiffs' objections include: (1) the plain terms of the 2010 Agreement only permits account-holders and MetaBank to invoke the arbitration provision, and therefore it was error for the Magistrate Judge to allow Bluestem to invoke it; (2) the Magistrate Judge legally erred in determining whether Bluestem may invoke the arbitration provisions as a nonsignatory based on equitable estoppel; (3) the Magistrate Judge legally erred in determining whether Bluestem may invoke the arbitration provisions as a nonsignatory based on agency; (4) the R&R misstates the record; (5) the Magistrate Judge ignored Plaintiffs' argument that Bluestem's Terms of Service govern this dispute, and (6) the Magistrate Judge failed to address Plaintiffs' argument that Arce's California's Auto-Renewal Law claims are not within the scope of the arbitration provisions.

*Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  "[A]n agreement to arbitrate is a matter of contract, and 'is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration.'"  *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)); *see also Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011) ("[T]he FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." (quoting *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004)).  In determining whether a claim is arbitrable, the court must first decide whether a valid agreement to arbitrate exists between the parties, and then decide whether the specific dispute falls within the scope of that agreement.  *Pro Tech*, 377 F.3d at 871.  "In engaging in the inquiry, the Court applies 'ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter.'"  *Simitar Entm't, Inc. v. Silva Entm't, Inc.*, 44 F. Supp. 2d 986, 992 (D. Minn. 1999) (quoting *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 161 F.3d 1154, 1156 (8th Cir. 1998)).[11]

---

[11] To determine questions of contract formation, the Court applies the law of Plaintiffs' home states – Georgia for Parm, Texas for Bowers, California for Arce, and Florida for Osorio. Though Bluestem argued that Utah and South Dakota law are relevant to contract formation because those state laws were referenced in the 2014 and 2010 Agreements, respectively, Bluestem argued in the alternative that the application of the law of the parties' home states would be permissible.

If claims are arbitrable under the FAA,[12] the claims must be referred to arbitration "on application of one of the parties," 9 U.S.C. § 3, and the judicial proceedings must be stayed pending that arbitration, *see id.* §§ 2, 3.  "By its terms, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district court **shall** direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'"  *Pro Tech*, 377 F.3d at 871 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1995)).

After thoroughly reviewing the record and the parties' arguments, the Court agrees with the Magistrate Judge that some of Plaintiffs' claims are subject to arbitration. However, the Court rejects the R&R's reasoning to the extent it conflicts with the reasoning in this Order, pursuant to the Court's power to "accept, reject, or modify" the recommended disposition."  Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3).

Because the Court's analysis differs from the R&R and the Court finds that not all of Plaintiffs' claims are arbitrable, the Court will comment on issues beyond the scope of Plaintiffs' specific objections as necessary.  First, the Court analyzes which contracts bind the parties; second, the Court considers the scope of the applicable arbitration provisions and whether Plaintiffs' complaints fall within that scope; third, the Court considers the degree to which Bluestem may invoke the arbitration provisions.

---

[12] The FAA governs written arbitration provisions in any "contract evidencing a transaction involving commerce."  9 U.S.C. § 2.  The parties agree that the credit agreements relate to transactions involving commerce.

A.      THE APPLICABLE CONTRACTS

1.      Credit Agreements

Parm and Bowers concede that they are bound by the 2010 Agreement between themselves and MetaBank.  Bluestem argues, however, that Parm and Bowers are bound by the terms of the 2014 Agreement between them and WebBank, since the 2010 Agreement contains a clause allowing MetaBank to make future modifications.

In order to prove modification, a party must show that the other side had notice of the change.  *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 849 (S.D. Tex. 2011); *see also Moore-Dennis v. Franklin*, 201 So. 3d 1131, 1139-40 (Ala. 2016) (examining Alabama law and cases from other jurisdictions).  All of the cases Bluestem cites on this point were distinguishable from the case at hand in that in those cases, the party modifying the contract's terms provided notice of the modification to the other party.  *See Cicle v. Chase Bank USA*, 583 F.3d 549, 551, 555 (8th Cir. 2009); *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 225-27 (5th Cir. 2008); *Elinich v. Discover Bank*, No. 12-1227, 2013 WL 342682, at *1-2 (E.D. Pa. Jan. 29, 2013); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. 11-6555, 2012 WL 7683512, at *3-4 (C.D. Cal. Feb. 24, 2012); *Krutchik v. Chase Bank USA, N.A.*, 531 F. Supp. 2d 1359, 1361-65 (S.D. Fla. 2008).

The Banks did notify Parm and Bowers by mail of certain changes to their account terms, including the sale of the accounts to WebBank and changes in the interest rate, late fees, returned payment fees, and minimum monthly payments.  (App. at 233-35, 236-37, 477-78.)  But even assuming the modification clause in the 2010 Agreement permitted

Bluestem to unilaterally modify the arbitration clause, Parm and Bowers were not notified of such a change: they did not receive a copy of any of the later agreements in the mail; they received no letter or message from Bluestem or the Banks explicitly notifying them that there was an updated credit agreement at any point; and they were not prompted to review or accept any new terms in "clickwrap" form[13] in order to make website purchases after any update to the agreement.

Bluestem contends that the fact that updated terms were available in the footer on Fingerhut's website provided Parm and Bowers with sufficient notice of the updates. The Court disagrees; courts generally agree that mere use of a website does not indicate assent to the terms of this type of "browsewrap" agreement, given that Parm and Bowers were never even prompted to click on the link in the footer of the Fingerhut website. *Cf. Rodman v. Safeway Inc.*, No. 11-3003, 2015 WL 604985, at *11 (N.D. Cal. Feb. 12, 2015) ("[P]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." (quoting *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007))); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) ("[W]here consumers are urged to download free software at the immediate click of a button, a reference to the existence of

---

[13] "'Click-wrap' agreements require the user to review or scroll through terms and assent to the contractual terms by clicking a button that reads 'I Agree' or manifest some other means of express assent. . . ." *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 154-55 (Tex. Ct. App. 2006). In contrast, "'browse-wrap' agreements include terms and conditions that are either posted on the Web site, a hyperlink or are accessible on the screen, but do not require the user to expressly manifest assent." *Id.* at 155.

license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms.").[14]   Thus, Parm and Bowers received no notice of updates to the 2010 Agreement other than those specifically mentioned in mailings.  The Banks therefore did not effectively modify the 2010 Agreement or the arbitration provision therein, and the arbitration provision in the 2010 Agreement, as opposed to a later version of the Credit Agreement, is binding on Parm and Bowers.

As for Arce and Osorio, they were provided with detailed summaries of the applicable credit agreement (2013 for Arce and 2014 for Osorio) at the time they applied for their credit accounts.  The summaries explicitly put Arce and Osorio on notice that the complete terms of the contract would be sent to them, and indeed, Arce and Osorio subsequently received the full agreements in the mail.  Those agreements contained an arbitration clause that permitted the consumer to opt out within thirty days; neither Arce nor Osorio opted out.  Arce and Osorio then continued to use their credit accounts.  Therefore, Arce and Osorio agreed to, and are bound by, the version of the arbitration provision found in the 2013 and 2014 Agreements.[15]   *Krutchik*, 531 F. Supp. 2d at 1364-

---

[14] *See also Moore-Dennis*, 201 So. 3d at 1143 (endorsing cases in which a court expressly or impliedly held that "posting a notice on a Web page alone [did not] constitute[] sufficient notice that the . . . viewer of the Web page was entering into an arbitration agreement" without "proof that the recipient . . . visited the specific Web page containing the arbitration provision); *Hotels.com*, 195 S.W.3d at 155-56 (finding an arbitration provision in terms and conditions was likely enforceable when the terms and conditions were available through a link located directly above a click-box that stated "I Agree to the Terms and Conditions," in contrast to browsewrap that would "not require the user to expressly manifest assent").

[15] The arbitration provisions in the 2013 and 2014 Agreements are identical.  Therefore, although the Court finds that Arce assented to the 2013 Agreement, for brevity the Court will

(Footnote continued on next page.)

65; *see Rasschaert v. Frontier Commc'ns Corp.*, No 12-3108, 2013 WL 1149549, at *7 (D. Minn. Mar. 19, 2013) ("[R]eceipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry notice of those terms." (quoting *Specht*, 306 F.3d at 31)).

### 2.    Terms of Use

Plaintiffs posit that Bluestem's online Terms of Use – which does not contain an arbitration provision – is the only contract governing the relationship between Bluestem and the Plaintiffs who used Fingerhut's website (Parm, Bowers, and Osorio) because it is "the only agreement Plaintiffs made with Bluestem."   (Objs. at 12.)   However the existence of the Terms of Use does not rule out the possibility that the Terms of Use and the Credit Agreements may coexist, and that Bluestem as a nonsignatory to the credit agreements may invoke their arbitration provisions under theories available under state law – agency, equitable estoppel, or third-party beneficiary status. Thus, the Court declines to hold that as a matter of law, the Terms of Use is the only contract possibly governing Bluestem's relationship with Plaintiffs.

Having determined that each Plaintiff did agree to an arbitration provision, the Court next examines the scope of the arbitration provisions.

---

(Footnote continued.)

refer to the 2014 Agreement throughout in reference to the arbitration provisions that bind Arce and Osorio.

**B.      THE SCOPE OF THE ARBITRATION PROVISIONS**[16]

"It is a fundamental principle that a party cannot be forced to submit to arbitration if he [or she] has not agreed to do so." *Autonation Fin. Servs. Corp. v. Arain*, 592 S.E.2d 96, 98 (Ga. Ct. App. 2003) (citing *Volt Info. Scis. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).   "[T]he question of whether a contract's arbitration clause requires arbitration of a given dispute remains a matter of contract interpretation.  Such a determination rests on the intent of the parties." *Seaboard Coast Line R.R. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982) (citations omitted); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."); *Houston Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 412 (5th Cir. 2014) ("[T]he policy that favors resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties . . . ." (quoting *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transport Local 556*, 374 F.3d 372, 375 (5th Cir. 2004))).

---

[16] The "question of arbitrability" – that is, "whether a concededly binding arbitration clause applies to a certain type of controversy" – is presumptively a matter for courts to decide. *Oxford Health Plans v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013).  Neither party argues otherwise, and therefore the Court finds the question of the scope of the arbitration provisions, and whether Plaintiffs' claims fall within them, is a matter for the Court to decide.

### 1.     Interpreting the Applicable Contract Language

### a.     2010 Agreement

The arbitration provision in the 2010 Agreement defines the scope of covered

disputes as follows:

> [I]f a **dispute of any kind arises out of this Agreement**, either you[17] or
> we, at our sole discretion, can choose to have that dispute resolved by
> binding arbitration. . . . **Any claim, dispute or controversy, (whether in
> contract, regulatory, tort or otherwise, whether pre-existing, present or
> future and including constitutional, statutory, common law, intentional
> tort and equitable claims) arising from or relating to the credit offered
> or provided to you; the actions of yourself, us or third parties; or the
> validity of this Arbitration provision** (individually and collectively, a
> "Claim"), must, after an election by you or us, be resolved by binding
> arbitration . . . .

(App. at 7 (emphasis added).)

Courts have held that language in an arbitration clause purporting to cover all

disputes "arising out of or relating to" a contract is "broad and far reaching," *Chiron

Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000), and that when

applying an arbitration provision that is broad in scope, "t[o] trigger an arbitration

requirement, the movant's factual allegations need only 'touch matters' covered by the

contract containing the arbitration clause." *Homestake Lead Co. of Mo. v. Doe Run Res.*

---

[17] In the 2010 Agreement, "the words 'you' and 'your' refer to all persons named on the credit account we issue to you or who have signed application or acceptance forms, and the words 'we', 'us' and 'our' refer to MetaBank." (App. at 7.)  The 2010 Agreement further states that "you and MetaBank will be bound by this Agreement from the first time you use the Account." (*Id.*)

*Corp.*, 282 F. Supp. 2d 1131, 1138 (N.D. Cal. 2003) (quoting *Mitsubishi*, 473 U.S. at 624 n.13).[18]

Despite an arbitration provision's very broad language regarding the types of disputes that are arbitrable, courts have been hesitant to compel arbitration of claims that do not "touch matters" related to the underlying contract containing the arbitration provision.[19] The wisdom of this principle makes sense when applied to the 2010 Agreement, which purports to cover all disputes "arising out of or relating to . . . the actions of yourself, us or third parties." To hold that the 2010 Agreement could reach

---

[18] *See also Growtech Partners v. Accenture LLP*, 118 F. Supp. 3d 920, 929 (S.D. Tex. 2015); *DeStephano v. Broadwing Commc'ns, Inc.*, No. 01-20238, 2002 WL 31016599, at *7 (5th Cir. Aug. 20, 2002) (noting the Fifth Circuit broadly interprets the term "relates to"); *Khalatian v. Prime Time Shuttle, Inc.*, 188 Cal. Rptr. 3d 113, 119 (Cal. Ct. App. 2015); *Cover Four, L.L.C. v. Cardiac Sci. Corp.*, No. 07-661, 2007 WL 4245486, at *3 (N.D. Tex. Dec. 3, 2007) ("The text of the arbitration clause . . . focusing on claims or controversies **arising out of or relating to this Agreement or its breach**, embraces a sweeping range of potential disputes, reaching any conduct or claims logically connected to the written contract.").

[19] The Eleventh Circuit has held that "[t]he term 'arising out of' is broad, but it is not all encompassing" and that the term "'related to' marks a boundary by indicating some direct relationship; otherwise the term would stretch to the horizon and beyond." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218-19 (11th Cir. 2011); *see Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("Disputes that are not related – with at least some directness – to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause. . . . However, where the dispute occurs as a fairly direct result of the performance of contractual duties . . . then the dispute can fairly be said to arise out of or relate to the contract in question . . . ."); *U.S. ex rel. Vining Corp. v. Carothers Constr., Inc.*, No. 09-438, 2010 WL 1931100, at *3 (M.D. Ga. May 12, 2010) (same). California courts, similarly, have held that even when claims are not contractual claims based on enforcement of the underlying contract, in order to be arbitrable, the claims must have some link to the underlying contract. *See, e.g., Rice v. Downs*, 203 Cal. Rptr. 3d 555, 565 (Cal. Ct. App. 2016) ("[E]ven under a very broad arbitration provision, . . . tort claims must 'have their roots in the relationship between the parties which was created by the contract' before they can be deemed to fall within the scope of the arbitration provision." (quoting *Bos Material Handling, Inc. v. Crown Controls Corp.*, 186 Cal. Rptr. 740, 742 (Cal. Ct. App. 1982))).

any and all disputes regarding the actions of the parties and undefined third parties, even those claims wholly unrelated to the 2010 Agreement, would be an absurd result.[20] Therefore, while the Court finds that the arbitration provision in the 2010 Agreement is to be interpreted as broadly as possible, the plain language of the provision does not evince that the parties intended to submit to arbitration claims or disputes regarding the actions of themselves or third parties that do not in some way "touch" or "arise out of" or "relate to" the 2010 Agreement itself. *See generally Wexler v. AT&T Corp.*, No. 15-0686, 2016 WL 5678555, at *3 (E.D.N.Y. Sept. 30, 2016) ("[A]n arbitration clause that is unlimited in scope presents a question of contract **formation**."); *see also id.* at *4 (explaining that when applying state law to determine the meaning of terms in a contract containing an arbitration provision, "the words expressed must be judged according to 'what an objective, reasonable person would have understood [them] to convey'" and that when "checking a box accepting the 'terms and conditions' necessary to obtain cell phone service," a "reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement" (citation omitted)).

---

[20] For example, if MetaBank personnel sexually harassed a MetaBank employee, and that employee just happened to also have a revolving credit account under the 2010 Agreement, it would be an absurd result to find that the 2010 Agreement's arbitration provision would compel the employee to arbitrate, at MetaBank's election, an employment action regarding the harassment. *Cf. Smith v. Steinkamp*, 318 F.3d 775, 776-778 (7th Cir. 2003) (explaining that it would be an absurd result to interpret an arbitration agreement purportedly covering "all common law claims, based upon contract, tort, fraud, and other intentional torts" to truly waive any and all such claim against the drafter, as opposed to only waiving those "common law claims" that also "arise under" the underlying contract containing the arbitration clause).

### b.    2014 Agreement

The 2014 Agreement's arbitration provision states:

> [E]ither you[21] or we, at our sole discretion, can choose to have **any dispute arising out of or relating to this Agreement or our relationship** resolved by binding arbitration.
>
> . . . .
>
> For purposes of this Arbitration provision, **"dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes brought as counterclaims, cross claims, or third party claims.**

(App. at 1 (emphasis added).)

Like the 2010 Agreement, the 2014 Agreement's arbitration provision defines arbitrable "disputes" to include any type of claim originating in contract, tort, regulation, statute, or constitution.  The 2014 Agreement also defines "disputes" to include those "arising from or relating to . . . the goods or services you purchase."  A plain reading of

---

21 The beginning of the 2014 Agreement states: "You and WebBank will be bound by this Agreement from the first time a transaction is posted to your Account." (App. at 1.)  Next, the agreement states: "In this Agreement, . . . the words 'you' and 'your' refer to all persons named on the credit account we issue or who have signed the application or acceptance forms, and the words 'we', 'us' and 'our' refer to WebBank (and, as applicable, its agents, successors and assigns)." (*Id.*)

Separately, roughly in the middle of the provision beginning with the bolded term "**Arbitration**," the 2014 Agreement states: "In this Arbitration provision, the words 'we,' 'us,' and 'our' shall include WebBank and any assignees of any of WebBank's rights, any merchant from which you purchased goods or services using your Account, as well as their respective affiliates, servicers, employees, agents and further assigns." (*Id.*)

the provision makes clear that claims regarding "the goods or services you purchase" must still "aris[e] out of or relat[e] to this Agreement or our relationship," given that the discussion of disputes regarding "goods or services you purchase" is within the paragraph defining the term "dispute."

Bluestem encourages an expansive reading of this provision, effectively arguing that any dispute arising out of or relating to the relationship between Bluestem and Arce and Osorio is subject to arbitration because Bluestem (d/b/a/ Fingerhut) is a merchant from which Arce and Osorio purchased goods or services using their WebBank revolving accounts.  This argument is based on the language in the arbitration provision, located below the definition of arbitrable "disputes," which states that in the Arbitration provision, the terms "we," "us," and "our" refer not only to WebBank and its agents, but also to any merchant from which an account-holder purchases goods using the revolving account.  Thus, according to Bluestem, it may invoke the arbitration provision simply because Arce's and Osorio's claims "aris[e] out of or relat[e] to . . . [Bluestem's] relationship," (presumably, Bluestem's relationship with Arce and Osorio), whether or not Arce's and Osorio's claims also "aris[e] out of or relat[e] to" the 2014 Agreement or their relationship with WebBank.

Interpreting the language stating that arbitrable disputes are those "arising out of or relating to this Agreement or **our relationship**," the Court finds it would be absurd to read the term "our relationship" untethered from the Agreement as a whole, which establishes and defines the "relationship" between account-holders, on the one hand, and WebBank and its agents, successors, and assigns, on the other.  *See Wexler*, 2016 WL

5678555, at *2-3 (discussing *Smith v. Steinkamp*, 318 F.3d 775, 777-78 (7th Cir. 2003)). If "our relationship" referred to any future relationship between an account-holder and a merchant accepting the WebBank revolving credit account as payment, it is simply not clear what the contours of the "relationship" between the consumer and the merchant would be – would all claims between those two parties, regardless of relation to the 2014 Agreement, be arbitrable, even those wholly unrelated to the 2014 Agreement?  The argument that "our relationship" might refer to an undefined relationship between a consumer and a merchant is even less plausible given that at the top of the 2014 Agreement, the terms "we," "us," and "our" are defined to refer specifically to WebBank and its agents, successors and assigns.

The Court finds that reading the plain terms of the 2014 Agreement, it is simply unreasonable to find that by agreeing to the terms, Plaintiffs would have understood that any claims that might arise between them and a merchant from which Plaintiffs purchase goods in the future using the credit would be arbitrable.  *See Steinkamp*, 318 F.3d at 777-78.  To avoid this absurd result, the Court interprets the 2014 Agreement to mean that disputes that are arbitrable include only those that "aris[e] out of or relat[e] to" either (a) the 2014 Agreement or (b) the relationship between WebBank (and its agents, successors, and assigns) and the account-holder, as established in the 2014 Agreement. *Savage v. Citibank N.A.*, No. 14-3633, 2015 WL 2214229, at *4 (N.D. Cal. May 12, 2015) ("[T]he Court concludes that the 'our relationship' language in the [credit] card agreements must be limited to the relationship created by those agreements . . . ."); *see Wexler*, 2016 WL 5678555, at *4.

- 26 -

## 2.   WHETHER PLAINTIFFS' CLAIMS FALL WITHIN THE SCOPE OF THE ARBITRATION PROVISIONS

Plaintiffs' claims can be grouped into the following categories.  First, there are a number of counts alleging that Bluestem charged finance charges higher than those allowed under state usury laws.[22]  To the extent these counts allege that the interest rate charged for the revolving credit accounts, as stated in the credit agreements, is unlawful on its own or in combination with the alleged "hidden finance charges" (i.e., the inflated prices for goods sold by Fingerhut), these counts touch matters arising out of or relating to the 2010 and 2014 Agreements.  However, to the extent these counts allege that the hidden finance charges violate state law regardless of the interest rates charged under the credit agreements, these claims do not implicate the credit agreements or the relationship between Plaintiffs and the Banks in any way.  Bluestem set prices in its capacity as a merchant, completely unrelated to the revolving credit accounts – the only relationship between the pricing and sale of goods and the revolving credit accounts is that credit from the revolving credit accounts was used to pay for the goods.  But if Plaintiffs had paid for the goods in some other way, Plaintiffs' claim that the inflated prices alone amounted to hidden finance charges, would still stand.  *See Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, 533 F.3d 1342, 1347 (11th Cir. 2008) ("[A] dispute does not 'arise out of or in connection with' a contract just because the dispute would not have

---

[22] The relevant counts in the first category are: *Parm* Count 1 (violation of Georgia usury law); *Arce* Count 1 (violation of Texas usury law); *Arce* Counts 2 and 3 (violation of Florida usury law); and *Parm* Count 3 and *Arce* Count 14 (violation of Minnesota usury law).

arisen if the contract 'had never existed.'" (quoting *Seaboard*, 690 F.2d at 1351)). Therefore, claims in this category are only within the scope of the arbitration clauses to the extent they allege that the interest rate charged on the revolving credit accounts was unlawful.

Second, a number of counts allege that it was a violation of state or federal law for Bluestem not to disclose the alleged hidden finance charges.[23]  To the extent these counts simply allege that Bluestem should have disclosed that the prices included hidden finance charges, these claims do not relate to the revolving credit accounts in any way.  As with the claims discussed above, the only relationship between the pricing and the revolving credit accounts is that credit from the revolving credit accounts was used to pay for the goods.  Thus, the Court finds that these claims do not arise out of or relate to the credit agreements or Plaintiffs' relationship with the Banks, and therefore they are not within the scope of the arbitration provisions.

---

[23] The relevant counts in the second category are: *Arce* Counts 4 and 6 and part of Count 5 (failure to disclose hidden finance charges under California law); *Parm* Count 4 and *Arce* Count 13 (violation of Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44); and *Parm* Count 6 and *Arce* Count 11 (violation of the Truth in Lending Act, 15 U.S.C. § 1631).

The Court notes that for purposes of the Truth in Lending Act, 15 U.S.C. § 1631 requires certain disclosures from "creditors."  *See* 15 U.S.C. § 1602(g) (defining "creditor").  The Court understands Plaintiffs' argument to be that Bluestem is a "creditor" separate and apart from the Banks' provision of credit to Plaintiffs through the revolving credit accounts.  The Court does not decide at this time whether Plaintiffs' interpretation of the statute is valid; the Court merely finds that to the extent Plaintiffs' claims arising under the Truth in Lending Act § 1631 rely on the argument that in setting inflated prices for goods, Bluestem was a "creditor" and therefore subject to the Act's disclosure requirements, these claims do not "arise out of or relate to" the credit agreements or the Plaintiffs' relationship with the Banks.  The same analysis applies to any applicable state statutes under which Plaintiffs bring their claims.

Third, both complaints include unjust enrichment claims.[24]   To the extent that Plaintiffs claim unjust enrichment solely in relation to Bluestem's sale of goods and pricing for those goods – as opposed to the Banks' provision of credit through the revolving credit accounts – these claims do not arise out of or relate to the credit agreements or Plaintiffs' relationship with the Banks and thus are not within the scope of the arbitration provisions.

Fourth, certain counts allege that Bluestem failed to comply with legal requirements regarding disclosure of the interest rates and/or finance charges charged under the revolving credit accounts.[25]   These counts clearly challenge the practices of the Banks in carrying out the terms of the credit agreements.   Therefore, these claims arise out of or relate to the credit agreements and are within the scope of the arbitration provisions.

Fifth, certain counts specifically challenge the legality of SafeLine under California's Auto-Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*[26]   SafeLine is something of an "add-on" to the revolving credit accounts offered by the Banks – the program adds an extra monthly charge to consumers' credit account bills in exchange for something resembling insurance in the event the consumer falls behind on his or her

---

[24] The relevant counts in the third category are: *Parm* Count 5 and *Arce* Count 15.

[25] The relevant counts in the fourth category are *Parm* Counts 2 and 7 and *Arce* Count 12 (alleging violation of the Truth in Lending Act, 15 U.S.C. § 1637(a)(5)) and part of *Arce* Count 5, to the extent that count is based on Bluestem's disclosure of the revolving credit accounts' interest rate .

[26] The relevant counts in the fifth category are *Arce* Counts 7, 8, 9, and 10.

payments to the Banks.   The Court finds that the claims challenging the legality of SafeLine arise out of or are related to the credit agreements; therefore, these claims are within the scope of the arbitration provisions.

### C.     WHETHER BLUESTEM MAY COMPEL ARBITRATION UNDER THE CREDIT AGREEMENTS

As a general rule, nonsignatories to a contract may not enforce an arbitration clause within that contract.  But state law contains exceptions to this principle, and "[t]he Supreme Court has ruled that state contract law governs the ability of nonsignatories to enforce arbitration provisions."  *Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 732 (8th Cir. 2009) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Nonsignatories may compel arbitration under the following three doctrines: (1) agency; (2) equitable estoppel (sometimes referred to in the arbitration context as "alternative estoppel"); and (3) third-party beneficiary theory.[27]   Bluestem argues that all three of these doctrines provide a basis for it to invoke the arbitration provisions as to all of Plaintiffs' claims.

The Court need only rely on equitable estoppel to compel arbitration of all of Plaintiffs' claims that fall within the scope of the arbitration provisions (*Parm* Counts 2

---

[27] *See Garcia v. Dell, Inc.*, 905 F. Supp. 2d 1174, 1177-78 (S.D. Cal. 2012); *JSM Tuscany, LLC v. Superior Court*, 123 Cal. Rptr. 3d 429, 445 (Cal. Ct. App. 2011); *Triad Health Mgmt. of Ga., III, LLC v. Johnson*, 679 S.E.2d 785, 788 (Ga. Ct. App. 2009); *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 189, 191-92 (Tex. 2007); *Price v. Ernst & Young, LLP*, 617 S.E.2d 156, 159-60 (Ga. Ct. App. 2005);  *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 944-45 (Fla. Dist. Ct. App. 2004); *In re Rolland*, 96 S.W.3d 339, 344 (Tex. Ct. App. 2001).

and 7 and *Arce* Counts 7-10, 12, and part of 5).  Therefore, the Court declines to address Bluestem's alternative arguments that agency and third-party beneficiary doctrines also permit Bluestem to invoke the arbitration provisions.

"[T]he *sine qua non* for application of equitable estoppel as the basis for allowing a nonsignatory to [compel arbitration] is that the claims the plaintiff asserts . . . must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause."  *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 540 (Cal. Ct. App. 2009).  *See Koechli*, 870 So. 2d at 944 (explaining that equitable estoppel applies under Florida law "when the signatory's claims allege substantially interdependent and concerted misconduct by the signatory and the non-signatory or when the claims relate directly to the contract and the signatory is relying on the contract to assert its claims against the non-signatory"); *see also Price*, 617 S.E.2d at 159-60 (same applying Georgia law).  *But see In re Merrill Lynch*, 235 S.W.3d at 191-95 (generally accepting that when a party seeks to derive a direct benefit from a contract containing an arbitration clause, equitable estoppel applies under Texas law, but rejecting the rule from other jurisdictions that a nonsignatory may compel arbitration "based solely on substantially interdependent and concerted misconduct").  As a general matter, the purpose of the doctrine of equitable estoppel is "to prevent a party from using the terms or obligations of an agreement as the basis for his [or her] claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement."  *Goldman*, 92 Cal. Rptr. 3d at 543-44.

The claims that are within the scope of the 2010 and 2014 Agreements challenge the legality of practices memorialized in the Credit Agreements. The Court finds that this is a sufficient nexus between the claims and the agreements containing the arbitration provisions that to preclude Bluestem from invoking the arbitration provisions would be fundamentally unfair, given that these claims directly rely on and are dependent upon the terms of the 2010 and 2014 Agreements. *See Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1311-12 (11th Cir. 2005) (finding that a loan servicer who was not a signatory to the underlying contract could invoke the arbitration provision therein when the plaintiffs' "[statutory] claims ar[o]se from [the loan servicer's] alleged obligation to service the [contract] **and** the statutory requirements that coincide with that obligation"), *abrogated on other grounds, as recognized in Matthews v. Ultimate Sports Bar, LLC*, 621 F. App'x 569, 572 (11th Cir. 2015); *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1404 (S.D. Fla. 2014) ("Gunson cannot rely on the interest rate on one page of the Loan Agreement to subject Defendants to liability while denying the applicability of the arbitration provision on the other page."). Therefore, Bluestem may invoke the arbitration provisions as to these claims under the doctrine of equitable estoppel.

For those counts that challenge the legality of Bluestem's prices for goods and lack of proper disclosures related to those prices (*Parm* Counts 1 and 3-6 and *Arce* Counts 1-6, 11, and 13-15), to the extent those counts challenge only Bluestem's pricing scheme, the claims do not fall within the scope of the arbitration provisions and therefore neither Bluestem nor the Banks could invoke the arbitration provisions regarding these

claims.[28]  However, to the extent those counts allege that the interest rates and/or finance

charges that the Banks charged for the revolving credit accounts (and that Bluestem

---

[28] The three exceptions allowing a nonsignatory to invoke an arbitration provision also do not apply.  First, without deciding the contours of any agency relationship that may have existed between Bluestem and the Banks, the Court notes that Bluestem's pricing scheme was not a function within the scope of Bluestem's written agreement with the Banks to "service" the revolving accounts.  The parties agree that the selection, pricing, and sale of merchandise were functions Bluestem simply performed in its capacity as a retailer.   The Banks had no involvement in or control over these tasks.  *See Koechli*, 870 So. 2d at 944 ("We reject the broad construction of the agency exception urged by appellants, which would permit a non-signatory agent to a signatory to invoke arbitration simply because the agency relationship exists. This argument erroneously blurs the legal distinction between individual capacity and representative capacity which is 'a meaningful legal difference.'" (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 466 (5th Cir. 2002))).

Second, given that the act of pricing merchandise is wholly unrelated to the 2010 and 2014 Agreements and the Banks' provision of credit to Plaintiffs, Plaintiffs are not estopped from rejecting Bluestem's attempt to arbitrate those claims.  The mere fact that the credit agreements set up Plaintiffs' ability to pay for Fingerhut's goods using credit, and Plaintiffs did use their revolving credit accounts to purchase the goods, does not mean that a challenge to Fingerhut's actions independent of the agreements – setting prices – amounts to a challenge that "relies on the terms of [the credit agreements]" or is "intertwined with the [credit] agreement[s]." *Goldman*, 92 Cal. Rptr. 3d at 542-43.  The Court finds that to the extent Plaintiffs challenge Bluestem's setting of prices, Plaintiffs are not seeking to "have it both ways," and thus, denying Bluestem's motion as to these claims is not inequitable or unfair.  *Id.* at 543 (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)); *see also id.* at 555 (noting that "the 'linchpin' for equitable estoppel 'is equity – fairness'" (quoting *Grigson*, 210 F.3d at 528)); *Masters v. Lowe's Home Ctrs., Inc.*, No. 09-255, 2009 WL 1657925, at *4 (S.D. Ill. June 11, 2009) ("Although Masters was arguably exercising one of her rights under the Agreement in making her credit card payment at a Lowes store, her claim against Lowes does not refer to nor depend on her contractual rights.  In a very real sense, any consumer who pays a merchant by credit card is exercising one of her rights under that credit agreement.  Surely, the doctrine of equitable estoppel does not mean the merchant can shelter under the arbitration provisions of those agreements.  There is no inequity unless the plaintiff refuses to abide by the arbitration provisions of a contract while simultaneously insisting that the non-signatory defendant abide by the terms of the contract.").

And lastly, while the Banks may have intended that merchants, including Bluestem, be able to invoke the arbitration provision in the 2014 Agreement as third-party beneficiaries, this does not do away with the separate requirement that a dispute must "aris[e] out of or relat[e] to the [2014] Agreement or [Plaintiffs' and WebBank's] relationship" in order for a third-party beneficiary to compel arbitration.

implemented as servicer of the accounts) were either unlawfully high or not properly disclosed, Plaintiffs are equitably estopped from denying Bluestem's ability to compel arbitration of those claims.  Thus, the Court will grant in part and deny in part Bluestem's motion to compel arbitration.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, Plaintiffs' Objections to the R&R [Case No. 15-3437, Docket No. 100; Case No. 16-624, Docket No. 94] are **OVERRULED in part** and **SUSTAINED in part**, and the Magistrate Judge's Report and Recommendation [Case No. 15-3437, Docket No. 94; Case No. 16-624, Docket No. 93] is **ADOPTED in part** and **REJECTED in part**. Accordingly, **IT IS HEREBY ORDERED** that and Defendant Bluestem Brands, Inc.'s Motion to Compel Arbitration and to Dismiss Without Prejudice [Case No. 15-3437, Docket No. 72; Case No. 16-624, Docket No. 71] is **GRANTED in part** and **DENIED in part**, as follows:

1.      Defendant's motion is **GRANTED** with respect to Counts 2 and 7 in the *Parm* Complaint [Case No. 15-3437, Docket No. 1] and Counts 7-10 and 12 in the *Arce* Complaint [Case No. 16-624, Docket No. 1].  The Court orders individual arbitration of these counts and they are **DISMISSED without prejudice**.

2.      Defendant's motion is **GRANTED** with respect to Counts 1 and 3-6 in the *Parm* Complaint [Case No. 15-3437, Docket No. 1], and Counts 1-6, 11, and 13-15 in the *Arce* Complaint [Case No. 16-624, Docket No. 1], only to the extent that those counts

assert claims that are within the scope of the applicable arbitration provisions, as described herein. The Court orders individual arbitration of such claims and they are **DISMISSED without prejudice**.

3.     Defendant's motion in all other respects is **DENIED**. Thus, to the extent Plaintiffs' claims, as stated in Counts 1 and 3-6 in the *Parm* Complaint [Case No. 15-3437, Docket No. 1], and Counts 1-6, 11, and 13-15 in the *Arce* Complaint [Case No. 16-624, Docket No. 1], do not fall within the scope of the applicable arbitration provisions as described herein, such claims are not subject to arbitration and are neither dismissed nor stayed.

DATED:  March 30, 2017                               ____s/ John M. Tunheim____
at Minneapolis, Minnesota.                                    JOHN R. TUNHEIM
                                                                        Chief Judge
                                                          United States District Court